# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

**RANDALL PIERSON,**
**NANCY LANDSKROENER,**
**LONZIE RAYMOND,**
**DEBORAH POLOSKEY,**
**ALLAN MURRAY, BRIAN**
**EASON, MARTIN ZANE, JOSE**
**RODRIGUEZ, KENNETH**
**COOPER, and SANDRA GOREN,**

**Case No.:**
**Hon.:**

| There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint |
| --- |

  **Plaintiffs,**

      vs

**DHL HOLDINGS USA, INC., DHL EXPRESS USA, INC,**
**NATIONAL UNION FIRE INSURANCE COMPANY,**
**SPECIALTY RISK SERVICES LLC,**
**SEDGWICK CLAIMS MANAGEMENT SERVICES, INC,**
**NEW HAMPSHIRE INSURANCE CO,**
**HARTFORD INSURANCE COMPANY**
**OF THE MIDWEST, CAMBRIDGE INTEGRATED**
**SERVICES GROUP, INC, INSURANCE COMPANY**
**OF THE STATE OF PENNSYLVANIA,**
**foreign corporations, DR. PAUL DROUILLARD,**
**DR. PHILLIP MAYER, DR. JEFFREY LAWLEY,**
**SAMANTHA MINEHART, LAURIE DEXTER, JUDITH MARSHALL,**
**and BELINDA BELASCO  Jointly and Severally,**

  **Defendants**.
_____/

Marshall Lasser (P25573)
MARSHALL LASSER PC
Co-Counsel for Plaintiffs
PO Box 2579
Southfield, MI 48037
mlasserlaw@aol.com

Jeffrey T. Stewart (P24138)
Seikaly & Stewart P.C.
Co-Counsel for Plaintiffs
30300 Northwestern Hwy ste 200
Farmington Hills, MI 48334
(248) 785-0102
stewart@seikalystewart.com

## CIVIL RICO COMPLAINT AND JURY DEMAND

## JURISDICTION AND VENUE

1.      Federal question jurisdiction is conferred by plaintiffs' claims under the Federal Racketeer Influence and Corrupt Organizations Act, 18 U.S.C. §1961 et seq (RICO).    Diversity of citizenship jurisdiction, not necessary to this RICO case, is conferred by 28 U.S.C. §1332 (plaintiffs are citizens of Michigan, defendants DHL HOLDINGS USA, INC., DHL EXPRESS USA, INC, NATIONAL UNION FIRE INSURANCE COMPANY, NEW HAMPSHIRE INSURANCE CO, INSURANCE COMPANY   OF   THE   STATE   OF   PENNSYLANIA,   SPECIALTY    RISK SERVICES LLC, SEDGWICK CLAIMS MANAGEMENT SERVICES, INC, and CAMBRIDGE INTEGRATED SERVICES GROUP, INC., are foreign corporations or other foreign legal entities; Dr. Drouillard, Dr. Lawley, and Dr. Mayer are citizens of Michigan, and the amounts in controversy exceed $75,000).

2.   Venue is properly laid in the Federal District Court for the Eastern District of Michigan because plaintiffs reside in that district and defendants do business in person and through their agents and representatives in that district, in Wayne and Oakland Counties, Michigan.

3.   The predicate acts complained of herein involve interstate commerce, the interstate use of the United States mails and electronic communications, intrastate mail, and were acts of mail fraud and wire fraud in violation of 18 U.S.C. 1341 and 1343.

4.   Because Kenneth Cooper, Barbara Odowd Wood, Brian Murray and David Callison have released all defendants except Dr. Drouillard and Dr. Mayer from a RICO claim, these plaintiffs do not sue the released parties.   Any defendant released after the date of the filing of this complaint is not sued.

### PARTIES TO THE RICO ACTION

5.   Plaintiffs DEBORAH POLOSKEY, RANDALL PIERSON, LONZIE RAYMOND, NANCY LANDSKROENER, JOSE RODRIGUEZ, ALLAN MURRAY, MARTIN ZANE, SANDRA GOREN, and  BRIAN EASON, reside within the jurisdiction of this district court.  They were or are employees of DHL HOLDINGS USA, INC ("DHL") or DHL EXPRESS USA, INC ("DHL Express").  DHL HOLDINGS USA, INC., DHL EXPRESS USA, INC, NATIONAL UNION

FIRE INSURANCE COMPANY ("National Union"), NEW HAMPSHIRE INSURANCE CO ("New Hampshire"), INSURANCE COMPANY OF THE STATE OF PENNSYLANIA ("Ins Co of Penn") Specialty Risk  Services LLC ("SRS"), SEDGWICK CLAIMS MANAGEMENT SERVICES, INC. ("Sedgwick") and CAMBRIDGE INTEGRATED SERVICES GROUP, INC., ("Cambridge") are foreign corporations or other foreign legal entities.  Drs. PAUL DROUILLARD, JEFFREY LAWYER and PHILLIP MAYER reside in Michigan, working in Wayne County and residing in or near Wayne County.   On information and belief, Belinda Belasco, Judith Marshall, Samantha Minehart, and Laurie Dexter live and or work in Oakland County, Michigan.

6.   DHL and or DHL Express bought Airborne express in about 2003.  When DHL and or DHL Express bought Airborne Express, it and DHL Express assumed responsibility for adjusting or reporting to the appropriate insurer and claims adjusting service, or paying, the workers compensation liabilities for plaintiffs who were injured while working for Airborne and who became the employees of DHL or DHL Express after DHL bought Airborne Express.  The operations of DHL and DHL Express are integrated with each other; the trucks driven by employees of DHL Express bore the DHL logo and not the logo of DHL Express; the uniforms of DHL Express employees bore the name DHL and not DHL Express; there was one seniority list for both DHL

and DHL Express employees in the Detroit area; the Detroit area managers for DHL managed at the same time the union employees of DHL express; workers compensation claims for DHL Express employees were handled by the same people at SRS, Cambridge or Sedgwick; pay checks, sick pay checks and vacation checks were paid to DHL Express employees by DHL. DHL Express and DHL were therefore the alter egos of each other. These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

## SUMMARY DESCRIPTION OF THE MICHIGAN
## WORKERS COMPENSATION SYSTEM

7. A.   This case alleges fraudulent denial by defendants of dozens of claims for benefits due plaintiffs and class members under the Michigan Workers Disability Compensation Act ("WDCA"), MCL 418.101 et seq.  The Michigan Supreme Court has stated, with regard to the purpose of this Act, that:

> Any worker's compensation schema has, therefore, as its primary goal, the delivery of sustaining benefits to a disabled employee as soon as possible after an injury occurs, regardless of any traditional concepts of tort liability. The objective of the social legislation is to provide the disabled worker with benefits *during* the period of his disability so that the workers and his dependents may

survive (literally) the catastrophe which the temporary cessation of necessary

income occasions..   [emphasis by the Court]

Thus, the Supreme Court has emphasized that one goal of the WDCA is to provide

*prompt* payment of benefits *during* disability.

7. B.  The WDCA provides for compensation for sudden injuries (e.g., truck

crash, fall from a scaffold) under §301 (MCL 418.301).    The Act provides

compensation for injuries that may arise from incidents on several specific dates (e.g.,

herniated disc due to lifting heavy boxes on 3 different dates), or from repetitive

duties of the occupation (e.g., rotator cuff tear due to repetitive overhead lifting),

under §§301 or 401.

7. C.  The primary benefits are weekly payments to substitute for wages loss

because of the disability, and medical care and medicine for the injury (§§301-315,

361).   The seriously injured worker who needs help dressing, bathing, taking his

medicine, etc, may get attendant care paid by the insurer.

7. D.   An employer make buy workers compensation insurance or qualify for

self-insurance.  Many self-insureds hire Third Party Administrators (TPAs), such as

defendant Sedgwick, to assist in the handling of claims.   In this complaint, "insurer"

refers collectively to insurer, self-insurer, and the TPA.

7.  E.  A worker who seeks benefits will report the injury to his employer, who

is required to report the injury to the Michigan Workers Compensation Agency on a Form WC-100, Employer's Basic Report of Injury (a form prescribed by the Agency; see §801(1), and Rules 1 and 2 of the Administrative Rules, R 408.31 and .32; the forms may be found on the Agency's website, www.michigan.gov/wca.).  The employer must give a copy of the Form WC-100 to the worker.

7. F.  **The Notice of Dispute.** An insurer must pay an undisputed claim within 30 days after it is due or payable, or pay a $50 per day penalty.  However, if the insurer files Form WC 107, Notice of Dispute, it will owe no penalty - *even if the insurer files a fraudulent notice of dispute.*

*Worker's Compensation in Michigan: Law and Practice,* by Edward Welch and Daryl Royal, The Institute of Continuing Legal Education, 2007-55-8010, is the standard treatise on workers compensation in Michigan.  It states in §17.63:

> It has been held that if there is any ongoing dispute whatsoever, even a frivolous or trivial one, the penalty statute may not be applied. *The dispute need not even be advanced in good faith.  Richardson v GMC*, 139 Mich App 727, 363 NW2d 22 (1984); *Maglothin v Tryco Steel Corp,* 137 Mich App 460, 357 NW2d 914 (1984); [additional citations omitted; emphasis added]

Appellate Commission ("WCAC") (§§859a - 861a); that appeal will take roughly 1.5

years.  The WCAC often remands the case to the magistrate for further findings. After the WCAC issues a final order, a party  may seek leave to appeal to the Court of Appeals and then to the Supreme Court (§861a(14)).   The Court of Appeals or Supreme Court may remand for further findings, and so on.  Thus, cases may take three, five, seven and even fifteen years before a final order is issued.

If an injured worker has been granted by the magistrate an "open award" of weekly benefits and medical care, the insurer, by appealing to the WCAC, is required to pay only 70% of the weekly benefits due (§862).  If the worker has been denied benefits, he gets nothing unless the WCAC or an appellate court reverses the magistrate's denial.

The current maximum weekly compensation rate is $750, or $39,000 per year. Medical bills for a serious injury can total $150,000.    Thus, the filing of a single fraudulent Notice of Dispute may delay receipt of $300,000 of benefits for years.  An injured worker who hires an attorney to litigate his claim (as 99.99% of workers do), must pay his attorney a fee up to 30% of the benefits recovered (Rule R408.44).

7. G.  The Notice of Dispute contains language declaring a State policy for "civil prosecution" of an insurer, employer  or TPA who fraudulently denies a claim:

> Making a false or fraudulent statement for the purpose of obtaining *or denying benefits* can result in criminal or civil

prosecution, or both, and denial of benefits. [emphasis added]

7. H.  Despite this declared policy in favor of civil prosecution of fraudulent denial of benefits, the WDCA contains no provision for civil prosecution of fraud in the denial of a claim.  There is no administrative rule providing for prosecution.  There has never been any civil prosecution in a Michigan court of fraud in the denial of a claim.  The civil prosecution of such fraud under RICO was first approved in *Brown v Cassens,* 546 F3d. 347 (2008).

7. I.  Section 385 of the WDCA empowers an insurer to compel a claimant to attend an examination or several examinations by a physician(s) chosen by the insurer; if the claimant fails to appear at the exams or obstructs them, his right to compensation shall be suspended and may be forfeited.   These exams are often requested by insurers **before** an Application for Mediation or Hearing has been filed with the Agency; that is, before any case is pending with the Agency.  The exams are often requested by an insurer and before any case has been filed by the worker, so that the insurer may decide (honestly or dishonestly) whether a worker has a work-related disability.   After a case has been filed with the Agency and is pending hearing, the insurer will often again cite a claimant to an examination.

The insurers label these "independent medical exams" (IMEs), and the doctors state they are conducting IMEs, but defendant doctors and certain other MI physicians

doing them are not independent in any sense of the word, because the workers compensation insurers pay them each $250,000 - 750,000 per year, year after year, to do 600-1,200 examinations per year, and because these doctors, including Drouillard, Mayer, Lawley, Asit Ray and Bala Prasad rarely find work-related disability regardless of facts, and because these doctors and the other defendants know the doctors will almost invariably supply IME reports which can be used to deny or cut off benefits.  This class of IME doctors are often called "cutoff" doctors by workers compensation lawyers.  They intentionally misrepresent the facts and medical conclusions for workers compensation insurance companies and give them reports they can cite as ground to cut off benefits being paid, or to deny benefits from the beginning.  (See, e.g., the New York *Times* investigative report, "Exams of Injured Workers Fuel Mistrust," pg 1, 4/1/09, describing lying by "IME" doctors such as Dr. Samuels, who admitted, "You have to give them [insurers] what they want, or you're in Florida.  That's the game, baby.")

The insurers use fraudulent reports as leverage to settle a case for less than it is worth; some magistrates even believe even the most notorious of the cutoff doctors.

7. J.  In a litigated workers compensation case, there is some discovery, limited to such issues as the claimant's past employment and job qualifications, or the nature of plaintiff's employment with the defendant employer.  However, a claimant cannot:

- discover fraud by an employer,  TPA or IME doctor in the denial of benefits. The claimant is not permitted to discover fraud in the case at hand, or in other cases involving the same insurer, TPA or employer (to demonstrate a pattern of fraud), because the hearing is limited to determining whether a worker is disabled, whether work contributed to the pathology, and damages (medical care and wage loss); see *Worker's Compensation in Michigan: Law and Practice, §17.32.*

- depose a claim adjuster to determine the facts and records upon which he relied in filing a Notice of Dispute in the case at hand or in other cases handled by that insurer, because such discovery is relevant only to the issue of fraud in the denial of benefits, which is an issue outside the scope of a workers compensation hearing;

- obtain the tax returns of IME doctors to prove what they have been paid by workers compensation insurers (a few doctors admit at deposition what they are paid in a given year, but none have recollection of how much they have been paid in, say, the last 3 or 5 or 10 years by workers compensation insurers);

- obtain the IRS 1099 forms from IME doctors to demonstrate what they are paid by particular workers compensation insurers;

- videotape an IME, and therefore the claimant is handicapped in proving the

11

examiner lied when he wrote that he examined A, B, C, D and E when in fact he only examined A and B; cannot

- obtain reports done by the doctor in the 200 or 1,000 other examinations he did that year, or for the defendant insurer or TPA, to find if a pattern of fraud exists.

- *Worker's Compensation in Michigan: Law and Practice,* states:

> Discovery is much more limited in worker's compensation than in civil courts.   There  are  no  discovery  depositions,  and  interrogatories  have traditionally been very limited... §17.17

> The traditional forms of discovery and pretrial hearings found in civil courts  are  not  available  in  worker's  compensation.....medical  testimony  is nearly always taken by deposition.......§17.29

Thus, a claimant in a worker's compensation cause is not able to *discover pre-hearing* fraud by the witness in conspiracy with the insurer, either in the proceeding at hand or and in the dozens or possibly hundreds of similar proceedings in which the witness has testified for the insurer.

Even if a claimant could somehow independently discover such evidence, it would be inadmissable in a worker's compensation hearing, which is a summary proceeding limited to issues of disability, work-relationship and damages.  Section

853 of the WDCA (MCL 418.853) provides, "Process and procedure under this act shall be as summary as reasonably may be."  See also *Worker's Compensation in Michigan: Law and Practice,* by Edward Welch and Daryl Royal, The Institute of Continuing Legal Education, 2007-55-8010,  §§17.12, 17.29, 17.32, 17.35, 17.36.

7. K.  With regard to the testimony of physicians, **a workers compensation proceeding  is not comparable to a judicial proceeding.**  Before the hearing, the plaintiff (the injured worker) cannot obtain discovery concerning the expert, as described in para. 7 K; he cannot discover the amount of money the expert has been paid over the years by the defendant insurer or TPA; he cannot discover reports written by the expert involving the insurer or TPA or similar cases.   In 99.99% of hearings, doctors testify by de bene esse non-videotaped deposition, so that the magistrate is unable to observe the demeanor of the witness.   At the de bene esse deposition, the plaintiff may cross examine the expert concerning the money he has been paid by the insurer or the TPA over the years, but if the expert states he does not remember, the plaintiff is stuck with the answer, because he is not permitted to obtain this financial information before the deposition; at the deposition, the plaintiff may cross examine the expert concerning his testimony in similar cases, but if the expert states he does not remember, the plaintiff is stuck with the answer because he cannot obtain the information before the deposition.   With regard to the critical expert

testimony, another key difference between a Michigan worker's compensation hearing and a civil trial  is that in the compensation hearing the fact finder (a worker's compensation magistrate) cannot observe the witness's demeanor; also, the magistrate cannot see what the physician does when he points out to the lawyers at the deposition findings on an MRI, CT scan, or X ray.

Given the inability of the magistrate to observe the expert's demeanor, see his explanations of radiographic tests and the physical examination, and question him, a workers compensation proceeding is not "functionally comparable" to a judicial proceeding, with regard to expert testimony given by way of deposition.

Add to those key differences the inability of a plaintiff in a workers compensation case to:

(a) discover evidence of the expert's conspiracy with the insurer in making a fraudulent report,

(b) discover the expert's conspiracy with the insurer in possibly a hundred other cases,

(c) discover the number of times the expert has testified for the defendant insurer that year or in years past, or

(d) discover the amount of money the defendant insurer paid the expert that year or in years past, or

(e) discover the number of examinations the expert did that year or in years past for Michigan workers compensation insurers, or

(f) discover the amount of money Michigan workers compensation insurers paid him that year and in years past, or

(g) introduce evidence (if somehow he has it) of the conspiracy or the number of times the witness testified for the insurer or the amount of money the insurer paid him.

## ALLEGATIONS COMMON TO ALL RICO CAUSES OF ACTION

8.     This case arises under the Racketeer Influenced Corrupt Organizations Act (RICO), 18 U.S.C. 1961 through 1968.

9.     DHL and DHL Express  (or  their predecessor Airborne Express) employed the plaintiffs.   DHL, DHL Express, and or its predecessor Airborne Express complied with its obligation, arising under the WDCA to provide its Michigan employees Michigan workers disability compensation  to have evidentiary support after a reasonable opportunity for investigation and discovery; except as noted in this complaint, the communications between and among DHL, SRS, Sedgwick and the Michigan workers compensation attorneys are in the exclusion possession of defendants and their attorneys.  All Notices of Dispute (NODs) mentioned in this complaint were mailed via the U.S. mails to the injured worker and to the State of

Michigan Workers Compensation Agency ("the Agency").  All "independent medical examination" (IME) reports were mailed and or faxed by defendants, using the wires.

10.  **The Enterprise or Enterprises.**  The allegations in this paragraph are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.  The predicate acts and violations of RICO alleged herein were committed by one or more of the following enterprises.  The participants in the enterprise changed over the years (such as when Sedgwick succeeded SRS as TPA for DHL).  At times one enterprise may have conspired or acted in concert with another enterprise to commit a common scheme of fraud; for example, Drs. Drouillard, Mayer and Lawley, who have their own enterprises writing fraudulent IME reports for dozens of Michigan employers, insurers and self insurers, wrote many reports for DHL and its TPAs; these doctors acted either as their own enterprise or as part of the enterprise to defraud operated by DHL and its TPAs (and the insurers, if they actively participated in the scheme).   The enterprises alleged here are:

(1) The workers compensation personnel at the workers compensation claims departments at SRS, Cambridge, Sedgwick, DHL, and DHL Express, handling Michigan workers compensation claims and associating in fact, formed an "enterprise" for purposes of the Racketeer Influenced and Corrupt Organizations Act

(RICO) claims in this case.   These persons included, inter alia, the named individual defendants other than the doctors.    Because they worked together regularly in adjusting and handling workers compensation claims for Michigan workers, they formed an enterprise.  The personnel at Cambridge, SRS and Sedgwick who handled Coke's Michigan workers compensation claims, and the Michigan defense attorneys who worked with Sedgwick, SRS, DHL and DHL Express on those claims, also handled Michigan workers compensation claims for other employers, such as Coca Cola.  Some of the Michigan workers compensation defense counsel may have been part of the enterprise.  The names of other persons in the enterprise are not known to plaintiffs.   Additionally or alternatively, the following persons or entities are an "enterprise" which acted to defraud plaintiffs of their workers compensation benefits:

(2)  the workers compensation claims personnel at Sedgwick who handled Michigan claims;

(3) the workers compensation claims personnel at SRS who handled Michigan claims;

(4) the workers compensation claims personnel at DHL and DHL Express who handled Michigan claims;

(5)  the workers compensation claim personnel at DHL, DHL Express and SRS and or Sedgwick handling Michigan claims, plus Dr. Paul Drouillard and or Dr. Philip

Mayer and or and or Dr. Jeffrey Lawley, associating in fact;

(6) the medical business and practices of Drs. Drouillard, Mayer, and Lawley each of which treats patients and which also generates what each doctor fraudulently calls "independent medical examinations";  for years these doctors, by means of their enterprises, have supplied hundreds or thousands of fraudulent IME reports to DHL, Coca Cola, Sedgwick, UPS, Liberty Mutual, Ajax Paving, and to other Michigan employers and workers compensation insurers and self insurers.

(7) the workers compensation defense attorneys for DHL and DHL Express may be and may have been part of the enterprise, or have aided or abetted or conspired with the enterprise.  Drs. Mayer, Lawley, Bala Prasad, Asit Ray, Emmanuel Obianwu and Drouillard, especially have been selected or recommended over a hundred times in the last 5 years by these lawyers for various clients to do "IMEs" which could be used to cut off or deny benefits, and these doctor have written cut off or denial reports in nearly all of these claims, whereas the injured workers' treaters, who perform few or no IMEs, found work related disability in these claims.   These defendants and lawyers have also repeatedly used Drs. Asit Ray and Emanuel Obianwu to obtain reports which could be used to cut off or deny benefits, rather than to obtain the truth; however, these doctors have been used much less frequently by defendants and their lawyers over the last 10 years.

(8)   the workers compensation claims personnel at Cambridge who handled Michigan claims.

(9)   The personnel at New Hampshire and National Union who handled Michigan workers compensation claims.

(10)   Dr. Philip Mayer and his medical business

(11)   Dr. Paul Drouillard and his medical business

(12)   Dr. Lawley and his medical business.

(13)   Dr. Lawley is a partner of or in the same practice as Dr. Drouillard. Garden City Orthopedics. Therefore, the enterprise may consist of Drs. Lawley and Drouillard together, and or Garden City Orthopedics.

11.   Dr. Drouillard participated in the conduct and management of the RICO enterprise of Dr. Paul Drouillard, and or participated in the conduct of one of the above enterprises, and or conspired with an enterprise in violation of 18 U.S.C. 1962(d).   Dr. Mayer participated in the conduct and management of the RICO enterprise of Dr. Phillip Mayer, and or participated in the conduct of one of the above enterprises, and or conspired with an enterprise in violation of 18 U.S.C. 1962(d), or aided and abetted the enterprise.   Dr. Jeffrey Lawley participated in the conduct and management of the RICO enterprise of Dr. Lawley, and or participated in the conduct of one of the above enterprises, and or conspired with an enterprise in violation of 18

19

U.S.C. 1962(d). Drs. Asit Ray, Bala Prasad and Emanuel Obianwu, not named as defendants at this time (pending discovery of the extent of their alleged participation in the scheme to defraud), may have participated in the conduct and management of the RICO enterprises of Drs. Obianwu, Prasad and Ray, and or participated in the conduct of one of the above enterprises, and or conspired with an enterprise in violation of 18 U.S.C. 1962(d).

11 A. In addition to other allegations in this complaint, each of the defendant doctors participated in the scheme to defraud by testifying and writing reports favorable to the defendant insurers and employer, and to employers, defendants and insurers in other cases (workers compensation, no fault, negligence, etc.), for the purpose earning hundreds of thousands of dollars per year, year after year, by doing IMEs and related depositions for insurers, employers, and defendants. The doctors intended the reports to be favorable to the persons and entities that hired them so they could continue to be hired and be paid hundreds of thousands of dollars a year, year after year, for their reports and testimony. They did not intend to make reports and give testimony that was truly independent.

12. Each enterprise was an organization which existed not only for the purpose of defrauding plaintiffs of their workers compensation benefits; the enterprise engaged in other activities, such as the administration of workers compensation claims and the

examination of individuals claiming workers compensation and other benefits. Each enterprise has existed for many years, and in each enterprise different persons had different roles concerning the conduct of the enterprise, not limited to the commission of the fraudulent acts complained of herein.

13. Two or more enterprises may have acted together to defraud one or more plaintiffs of their workers compensation benefits.

14. Plaintiffs suffered injury to their property within the meaning of RICO U.S.C. 1964(c) because the actions of defendants damaged their claims for workers compensation benefits, deprived them of workers compensation benefits, caused them to incur attorney fees and litigation expenses to recover benefits which should have been paid without dispute, and caused the loss money due to delayed receipt of benefits.

## THE SCHEME TO DEFRAUD (Paras. 15 - 32)

15A. DHL, the insurers and or their TPAs committed mail fraud, wire fraud and or conspiracy to defraud, in a repeated and continuing pattern extending over years applicable to plaintiffs and other Michigan employee of DHL and DHL Express, by: (1) fraudulently terminating or denying benefits, (2) writing fraudulent Notices of Dispute, (3) repeatedly hiring doctors such as Paul Drouillard, Jeffrey Lawley (Drouillard's partner or close associate), Philip Mayer, Bala Prasad, Asit Ray and

21

Emanuel Obianwu, whom defendants knew were "cut off" doctors, that is, doctors who could be relied on to write a false report, which defendants could use to cut off or deny benefits, rather than write and speak the truth; these doctors could be relied on to find no work-related disability and or pathology, regardless of the truth, so that their reports could be used as a basis to cut off or deny benefits; defendant insurers, TPAs and their lawyers knew these doctors would frequently give false testimony and or write false medical reports, or would write reports which would be biased in their favor and could be cited as grounds to deny or cut off benefits, (4) failing to honestly and in good faith review a claim as required by Michigan statute before denying the claim, and (5) fraudulently terminating benefits because a person refused to settle a claim for the amount offered by DHL, SRS, Cambridge and Sedgwick.  Defendants used the mails and wires in furtherance of this scheme, by mailing, emailing and or faxing Notices of Dispute and other communications.   These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

15B.   At times this fraud involved DHL's, DHL Express's, National Union's, SRS's and Sedgwick's repeated and frequent employment of "cut off" doctors such as Drs. Drouillard, Lawley, Mayer, Ray, Prasad and Obianwu, that is, doctors whom DHL, SRS, Sedgwick and their Michigan workers compensation defense attorneys

knew would predictably and reliably write them a report stating a claimant did not have a work-related disability whether or not such disability actually existed; DHL, Cambridge, SRS and or Sedgwick then used these reports as a grounds to cut off benefits which were being paid or to deny benefits before any were paid; SRS, Cambridge and or Sedgwick then cited the report in a Notice of Dispute filed with the Agency as the grounds for cut off or denial of benefits.  Defendants also committed fraud in that they referred to the examinations they set up with these doctors as "independent medical examinations" (IMEs) but they were not independent because the doctors received hundreds of thousands of dollars apiece each year from defendants and from other employers, insurers and claims adjusting companies involved in workers compensation claims, and these doctors received hundreds of thousands of dollars year after year, to do examinations and related depositions in workers compensation (and to a much smaller degree in other insurance cases).  On information and belief, defendants, perhaps through their attorneys, communicated with each other concerning the desire of DHL, Cambridge SRS and Sedgwick to obtain a report which these defendants could use to cut off or deny workers compensation benefits, or to defeat litigation claiming benefits, and concerning which findings these defendants and or their lawyers wanted in a report so as to be able to cut off or deny benefits.  DHL, Cambridge, Sedgwick and SRS, acting on their own

advice or upon the advice of their Michigan workers compensation attorneys, used Drs. Drouillard, Lawley, Ray, Prasad, Mayer and Obianwu dozens or scores of times in each of the years 2003-2011 to examine insurance claimants and to write cut off reports, and used other cut off doctors.   An examination of hundreds of consecutive reports from these physicians, dealing with hundreds of claimants, will demonstrate that they failed to find work-related disability in nearly all of their reports; this overwhelming finding of no work-related disability is proof of fraud by itself, and further proof will be supplied by the fact that scores of different surgeons and specialists treating these hundreds of claimants did find work-related disability at a far, far higher rate than any of the defendant doctors.   These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

15C.   Once DHL, SRS, Cambridge, New Hampshire, National Union and Sedgwick and their other defendants obtained a report from Dr. Drouillard, or another cut off doctor, they disregarded or did not honestly and in good faith assess reports and records from a claimant's treating doctors, but instead cut off or denied benefits, citing the cut off report.  These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

15D.  DHL, Cambridge, SRS Sedgwick and other defendants misrepresented to each of the plaintiffs, through the use of the US mails, that their cut off doctors were doing "independent" medical examinations of the claimants.  DHL, Cambridge, SRS and Sedgwick made hundreds of such misrepresentations to workers compensation claimants in the years 2003 through 2011 (to employees of DHL and other companies).  These representations were mailed by defendants to plaintiffs.  Defendants Drouillard, Mayer, and Lawley also represented to the plaintiffs and other injured workers that they were "independent" doctors or were doing "independent" medical exams.  These representations were false, because each defendant knew the doctors were not independent, in that they earned hundreds of thousands of dollars, each year for many years in a row, from DHL and other Michigan employers, TPAs, and workers compensation insurers and defense lawyers, doing examinations of Michigan workers compensation claimants, and that the doctors intended to and did write reports favorable to the employer/insurer/claim adjuster defendants regardless of facts.  Also, the employer/insurer/claim adjuster defendants knew the doctors were not independent but were in fact financially dependent upon self-insured employers, TPAs and workers compensation insurers for a large portion of their income.  DHL, Sedgwick, SRS, and the insurers and their Michigan workers compensation attorneys knew these doctors would generally or almost always write a report stating a worker

had no work related disability, or would write a report stating that any disability was not work-related.

15E.   DHL and its insurers and TPAs did not intend to fraudulently deny benefits to every Michigan workers compensation claimant, but to a significant number of workers who had suffered serious injuries.   The scheme targeted, especially, serious injuries, that is, injuries which had caused or were likely to cause loss of work for many months, and injuries where defendants believed they might be able to deny or cut off benefits based on dishonest and biased medical reports.

15F.  Defendants and their workers compensation attorneys knew that injuries not from a single incident but from multiple events at work or from the conditions and duties of the occupation could be compensable under sections 301 and or 401 of the WDCA, and were obligated to consider whether compensation was payable under section 301 or 401 of the WDCA.   In many instances, once they had determined that a single event was not the cause of a disability, they never considered whether the disability was compensable under section 301 or 401 as arising from multiple events at work or from the conditions of the occupation.

15G.   In some cases, the insurer denied or cut off benefits to a plaintiff or class member without citing the worker to an examination, but on grounds the insurer knew to be false.   (The class which plaintiffs seek to represent is that of Michiganworkers

who were injured working for DHL, or who suffered an occupational disease or injury compensable under the WDCA while working for DHL.)  In these cases, the insurer mailed a Notice of Dispute to the Agency and to the worker which contained a fraudulent reason for denial or cut off of benefits, such as "no evidence of disability" when the insurer had evidence of disability, or "injury not job related" when the insurer had proof the injury occurred during the course and scope of employment.

16.     In each of the cases in which they terminated or denied benefits based on the report of a defendant doctor, SRS, DHL, Sedgwick and the insurer defendants acted in bad faith and fraudulently in  failing to give any consideration or due consideration to the reports and records of a claimant's treating doctors, once they had received the report of a cut off doctor, such as Dr. Drouillard.  This intentional failure to give honest and good faith consideration to the records and reports of a claimant's treating doctors, and to honestly weigh those records and reports against the report of the cut off doctor, violated a duty owed by the insurers and their TPAs to the claimant under the Michigan Workers Disability Compensation Act, MCL 418.101 et seq (the Act), to be honest in the administration of a workers compensation claim.  This duty is inherent in the Act; also, MCL 418.631 specifically imposes a duty on an insurer or self-insurer not to "unreasonably fail to pay promptly claims for compensation for which it shall become liable."  This duty required defendants to weigh in good faith

the report of a doctor they hired to examine a claimant against the reports and records of a claimant's treating doctors,  and all other medical records, where the treating doctor found a work-related disability.  Defendants used the mails and wires in furtherance of this scheme, in violation of 18 U.S.C. 1341 and 1343.  These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

17.   DHL, SRS, Sedgwick and the insurer defendants fraudulently violated duties owed plaintiff under the Michigan Uniform Trade Practices Act, MCL 500.2001 et seq, (MUTPA) using the mails and wires in furtherance of their scheme, in violation of 18 U.S.C. 1341 and 1343.  MUTPA applies to workers compensation insurance; see MCL 500.2008 and 500.2016.   The duties imposed on defendants in the administration of workers compensation claims by the provision of that act required defendants to weigh in good faith the report of a doctor they hired to examine a claimant against the reports and records of a claimant's treating doctors,  and all other medical records, where the treating doctor found a work-related disability.  If MUTPA did not create duties to plaintiffs, deliberate violation of MUTPA is evidence of fraud.

The provisions of MUTPA which apply to this action are:

a. MCL 500.2006 **Timely payment of claims or interest.**   This section

imposes a duty to pay "on a timely basis" to "an individual ...directly

entitled to benefits under its insured's contract of insurance..." "Failure

to pay claims on a timely basis... is an unfair trade practice unless the

claim is reasonably in dispute." The "reasonably in dispute" language

imposed a duty on Sedgwick and Coke (as self insurer) to weigh in good

faith the report of a doctor they hired to examine a claimant against the

reports and records of a claimant's treating doctors, and all other medical

records, where the treating doctor found a work-related disability. This

section also provides that if benefits are not paid on a timely basis the

benefits shall bear simple interest after satisfactory proof of loss was

received by the insurer at the rate of 12% per annum.

b. MCL 500.2026 **Course of Conduct.** "[U]nfair or deceptive acts or

practices in the business of insurance, other than isolated incidents, are

a course of conduct indicating a persistent tendency to engage in that

type of conduct and include:

"(d) Refusing to pay claims without conducting a reasonable

investigation based upon the available information.

***

(f) Failing to attempt in good faith to effectuate prompt, fair and

equitable settlements of claims in which liability has become reasonably clear.

c.  MCL 500.2062 **False Reports.**  "(1) It shall be unlawful; for any person in any report required by law to be made by any insurance corporation.... to make any such statement or report as to fraudulently conceal the real facts."

The Michigan legislature intended these sections of MUTPA to apply to the administration of workers compensation claims because when the legislature wanted a section *not* to apply to workers compensation, it said so; see MCL 500.2006(6).

18.  Defendants owed plaintiff a duty of *prompt* payment of claims under the Workers Disability Compensation Act.   This duty was stressed by the Michigan Supreme Court said in *McAvoy v H. B. Sherman Co.* 401 Mich 419, 258 NW2d 414 (1977).

19.  Fraud by Drs. Drouillard, Lawley, Mayer and Prasad.

(A)  Drs.Drouillard, Lawley, Ray, Mayer and Prasad fraudulently misrepresented to the claimants in this case, and in other civil RICO cases involving UPS, Coca Cola, Sedgwick, Liberty Mutual, and other employers, insurers and claims administrators, that they were conducting an "independent" medical examination of the claimants; they knew this representation to be false because they knew they

received all or virtually all of their medical examination income from insurance companies or claim adjusters for insurance companies or self-insureds; because they knew they were financially dependent on workers compensation insurers, self insurers, and claims administrators for a very high percentage of their medical income (that is, income from the practice of medicine on patients, and doing IMEs and related depositions); and because they intended to write reports favoring the defendants in this case and other employers, insurers and claim adjusters in workers compensation and other insurance cases. Each year, an extremely high percentage (on information and belief, over 95%) of their IME reports on injured workers did not find work-related disability, whereas the scores or hundreds of different treating physicians for the same injured workers did find work-related disability, and other IME doctors hired by insurance companies to examine conditions similar to those examined by Drs. Drouillard, Lawley, Ray, Obianwu and Mayer did find work-related disability at a rate significantly higher than 5%.

(B) Drs. Mayer, Ray, Lawley, Drouillard and Obianwu, in an extremely high percentage of their IME reports, found no work related disability, regardless of facts. They found neither (1) work-relatedness of pathology nor (2) disability from the worker's occupation, a pattern which also demonstrates fraud because the issues of (1) work-relatedness of pathology and (2) disability from the worker's occupation are

unrelated issues, and an extremely high correlation of finding for the employer and insurer on both issues is a proof of fraud, especially where an industrial clinic chosen by the employer did initially find that a worker had a work-related injury and was disabled from his job, and the scores or hundreds of the workers' treating physicians did find disability and work-relatedness, and other IME physicians hired by insurers to examine similar conditions did find either disability from the worker's job or work-relatedness of pathology at a rate much higher than Drouillard, Lawley, Ray, Mayer and Obianwu.  These patterns demonstrate fraud.  They are evidence of an intent not to write reports which are "independent" of either party to a workers compensation claim, and an intent not to fairly and honestly accurately write IME reports.  The allegations of this paragraph are based in part on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

(C)  Drs. Drouillard, Mayer, Lawley, Ray and Prasad also participated in the scheme of fraud either by making statements of fact and opinion in depositions and reports knowing they were false, or by being indifferent to whether the statements were true or false when the statements served the financial interests of the insurers, adjusters and employers for whom they wrote reports and testified; they knew they served those financial interests  when testified or reported that a claimant's condition

was not work-related or a claimant was not disabled from his job.  The allegations of this paragraph are based in part on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

(D) In many of the years 2005 through 2011, Drs. Mayer and Drouillard each received about $500,000 a year from defendants and other Michigan employers, insurers and claims adjusting companies in workers compensation or auto accident cases for doing  "IMEs"; each had received millions of dollars in the ten year period preceding this suit from workers compensation defendants and insurers and claims adjusters, for doing  "IMEs".   Drs. Ray, Obianwu, Lawley and Prasad each received $50,000 to about $250,000 per year doing "IMEs," year after year.  The money may have been paid to the physicians by Medical Evaluation Specialists (MES) or similar entities, which contracted with insurers and employers to provide "IME" services to insurers and employers.  The allegations of this paragraph are based in part on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

(E)  These doctors violated a duty arising under their medical licenses, oaths and  standards, including those of the American Academy of Orthopedic Surgeons, to truly, fairly and honestly examine a claimant and to weigh the results of their examination against the reports and records they possessed from other physicians who

had examined or treated the claimant.  As part of their participation in the fraudulent

scheme, these doctors did not intend to honestly and fairly evaluate injured workers,

but intended to help the insurance companies and employers which paid them about

$500,000 a year, for many years.   This is fraud.  These doctors intended to and did

give opinions consistently favoring the insurance companies and employers, and they

intended to and did interpret facts and scientific literature in a way which would help

the insurance companies, claims adjusting companies  and employers, rather than in

an independent, fair and impartial manner, and they intended to and did conduct their

examinations and write their reports in such a way as to favor the insurance

companies, claim adjusting companies and employers, rather than in an independent,

fair and impartial manner, as a result of which their opinions overwhelmingly favored

the insurance companies and employers which hired them and paid each of them

millions of dollars over a few years.   This is fraud.  As part of their fraudulent

scheme, these doctors intended to represent facts and scientific literature in a way

which they believed would help the insurance companies and employers which paid

them, rather than represent the facts and literature in a manner independent of the

companies which paid them.   The doctors also misrepresented facts and literature to

help the companies which paid them.   The opinions of these doctors often far

exceeded reasonable schools of thought of medical practitioners who do not receive

34

hundreds of thousands of dollars a year doing so-called "independent medical examinations";  this is evidence of the intent of these doctors to help the insurance companies and doctors which paid them, rather than to give an opinion independent of the parties to the controversy.  For each of these doctors, in an extremely high percentage of their reports or testimony (on information and belief, more than 95%) they did not find work-related disability; this was their intent, regardless of the facts, and this statistic is evidence of the intent of these doctors not to give a independent report and testimony which was independent of the source of the payment they received.   The allegations of this paragraph are based in part on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

(F)  These doctors used the mails and wires in furtherance of this scheme, by mailing, emailing and faxing their reports and letters concerning examinations of injured workers compensation claimants, in violation of 18 USC 1341 and 1343.

(G) Drs. Mayer, Drouillard, Lawley, Ray and Prasad, as part of the fraudulent scheme, wrote examination reports and gave depositions with the intent of inducing the insurance companies and workers compensation claims administrators to send them more business, rather than with the intent of reporting and testifying objectively, fairly and without regard to making more money from more examinations and

depositions.   They did this for defendants, and in hundreds of other workers compensation cases for other insurers, self insured, and TPAs, and for no fault auto insurers.   These doctors intended to favor the insurance companies rather than be impartial.   The allegations of this paragraph are based in part on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

(H)   Dr. Mayer fraudulently and falsely portrayed the state of knowledge and the state of belief in the community of doctors treating the lumbosacral spine, concerning the factors which contribute to the progression of lumbosacral (LS) degenerative disk disease (DDD) and LS osteoarthritis, when he asserted in depositions and reports done for Sedgwick, SRS, DHL, Coca Cola, and other customers, in workers compensation cases, statements such as:

(1) "It was once thought that physical loading at work is a dominant risk factor for disk degeneration..... *That concept has now been proven to be outmoded and incorrect.*"   Depo in Bohn v Detroit Free Press, 9/21/09, p 60.

The italicized statement was fraudulent in that it has not "been *proven*.... outmoded and incorrect" as of 9/21/09 that "physical loading at work is a dominant risk factor for disk degeneration," and that Dr. Mayer knew when he made the statement that it

was false, or he made the statement without caring whether it was true or false.   There

existed at the time a difference of opinion in the relevant scientific community as to

the role of physical loading at work in causing the progression of LS DDD, and even

*The Spine Journal* article on which Dr. Mayer has substantially relied in giving this

opinion, "The Twin Spine Study: Contributions to a changing view of disc

degeneration," 9 (2009) 47-59, stated that occupational loading was a known

contributing factor to LS disc degeneration.   Similarly, Dr. Mayer's statement on

page 69 of the Bohn depo, that "there would be *no reason* to draw a conclusion that

because he was in a job that required the things as were described in this report

[repetitive heavy lifting of newspaper bundles weighing about 35#, with twisting and

bending], that that would have placed him at risk to have progression of his

underlying spinal pathology" [emphasis supplied] is fraudulent in that Dr. Mayer

knew that (1) *The Spine Journal* article on which he has greatly relied in his reports

and opinions stated that occupational loading played a role in LS DDD, and (2) there

is a split in opinion in the medical community over the role played by occupational

loading in the progression of LS DDD.

> (2) "*It is now known* that routine or repetitive loading may actually have
>
> a beneficial effect on the intervertebral disk."   Depo in Bohn v Detroit
>
> Free Press, 9/21/09, p 60.

37

This statement was fraudulent in that it was not "known" on 9/21/09 that heavy manual labor involving repetitive heavy lifting with twisting may benefit the LS disk; furthermore, the statement was made in a Michigan workers compensation case in which the claimant had severe LS disk pathology, and the statement was intended to portray falsely the risks of unrestricted manual labor for persons who have such pathology and workers compensation cases; similar statements were made by Dr. Mayer in the claims of plaintiffs, in this case and in other cases involving Sedgwick, who have LS disk pathology.   In fact, on 9/21/09 it was the consensus of doctors who treat LS disk pathology that "repetitive loading" such as with unrestricted manual labor is not advisable for persons with the degree of disk pathology demonstrated by persons such as plaintiffs Randall Pierson and Lonzie Raymond.

> (3) "The disk is *now thought* to behave like other musculoskeletal structures and benefits from exercise and physical stresses."  Depo in Bohn v Detroit Free Press, 9/21/09, p 60.

This statement was fraudulent in that it was not "thought" on 9/21/09 that heavy manual labor involving repetitive heavy lifting with twisting may benefit the LS disk; furthermore, the statement was made in a Michigan workers compensation case in which the claimant had severe LS disk pathology, and the statement was intended to portray falsely the risks of unrestricted manual labor for persons who have such

pathology and workers compensation cases; similar statements were made by Dr. Mayer in the claims of plaintiffs, in this case and in other cases involving Sedgwick, who have LS disk pathology.  In fact, on 9/21/09 it was the consensus of doctors who treat LS disk pathology that "physical stress" such as with unrestricted manual labor is not advisable for persons with the degree of disk pathology demonstrated by persons such as plaintiffs Randall Pierson and Lonzie Raymond, and Christopher Bohn.

(4) In the Bohn depo, Dr. Mayer fraudulently misrepresented the contribution heredity makes to LS DDD, stating page 88 that heredity is "at least "74 percent; The Spine Journal article on  which he relied put the contribution at about 37 percent.

(5) "There is very scant probability that work would worsen underlying pathology.  That's really considered one of the myths of pain."  Depo 6/30/09, pg 52, Lonzie Raymond v DHL.  This statement is fraudulent because the doctor knew when he made the statement the pathology of Mr. Raymond's LS spine (degenerative disc disease) was such that it could not honestly be stated "there is very scant probability that work would worsen underlying pathology," given, inter alia, that Mr. Raymond's job involved repetitive heavy lifting, twisting, bending and pushing, and given the state of medical research at that

time.  This opinion, and opinions he gave in other cases, was also fraudulent because the doctor had decided to give testimony and write reports favorable to the defendant, so that he could continue to earn hundreds of thousands of dollars per year doing IMEs for insurers.

(6)   In the Raymond case, on page 54 of Dr. Mayer's 6/30/09 depo. Dr. Mayer testified:

Q And is this gentleman at risk of any further injury or pathological change to his spine if he returned to work unrestricted, like you had suggested?

A No. There's no real evidence to suggest that.

This testimony was fraudulent.  Given Mr. Raymond's herniated LS disc and DDD, given the evidence in The Spine Journal of the role played by occupational loading in LS DDD, given Mr. Raymond's pain sketch indicating burning pain on the left side of his left foot, given the 2004 MRI showing left sided herniation impinging the nerve root, and given the existence of a significant school of thought holding that heavy lifting, twisting and bending contributes to the progression of  LS DDD and herniation, Dr. Mayer's opinion deliberately ignored "real evidence" "to suggest" that Mr. Raymond's return to a job requiring repetitive heavy lifting, twisting and bending would put Mr. Raymond "at risk of any further injury or pathological change to his spine."   The statement was fraudulent in the other ways described in this complaint.

(7)  Furthermore, even before release of *The Spine Journal* 2009 article "The Twin Spine Study,", Dr. Mayer very very rarely stated a person was disabled from manual labor, or that his occupation contributed to LS DDD, or that his occupation put him at risk for injury or pathological change; this was because Dr. Mayer was determined to favor the insurance companies and claims adjusters who paid him, rather than give a worker a truly fair and independent examination, report and deposition.

Statements similar to these were made by Dr. Mayer in reports he wrote and depositions he gave for DHL, Sedgwick, and or SRS in various workers compensation cases, such as several of the plaintiffs herein.

(8) PREDICATE ACTS BY DR MAYER, IN ADDITION TO THE ONES ALLEGED BY PLAINTIFFS.

(a) Dr. Mayer mailed a report in the Bohn case from Livonia Michiganto attorney Robert Humphrey, Auburn Hills Michiganon March 7, 2009; this was done in furtherance of the scheme to defraud Michigan workers compensation claimants.

(b) In the Michiganwork comp claim brought by Bradley Ries, Dr. Mayer mailed a report from Livonia Michiganto Providence Property & Casualty Insurance in Frisco, TX which was done in furtherance of the scheme to defraud Michigan workers compensation claimants.  Dr. Mayer lied in that report in that he said on page

2, "Mr. Ries, at the beginning of the interview, denied any prior history of back problems at all."  This was false, because Mr. Ries, in the presence of his fiancee, told Dr. Mayer before the physical examination that he had had back surgery in 2000.

20.    Dr. Drouillard committed fraud for DHL, UPS, Coca Cola, Sedgwick, SRS, Cambridge and Liberty Mutual Insurance Company,  by writing dozens of reports over a period of years (1) stating he examined a claimant or a body part of a claimant when he did not; (2) stating a claimant said something to him which the claimant did not say; (3) stating a claimant failed to disclose a fact which the claimant did disclose, and or (4) stating dishonestly and without reasonable medical basis that a claimant did not have a work-related disability.  Dr.  Drouillard was engaged in the business of writing such reports on behalf of MES Solutions, Medical Evaluation Specialists, and other companies which contract with physicians to do forensic medical examinations; he wrote fraudulent reports and gave fraudulent testimony on behalf of other employers, claim adjusting companies and insurers besides DHL, SRS and Sedgwick; in 2004-2008 he earned $500,000 - $600,000 per year doing forensic exams, writing reports of the exams, and testifying in depositions or at trial in cases arising out of those exams.

21.    A. Defendants' fraud was also accomplished in part by the termination of benefits for stated reasons which were a  mere pretext rather than a legitimate basis

42

for denial of benefits.

B.  Plaintiffs' damages were proximately caused by defendants' scheme of fraudulently and dishonestly denying workers compensation benefits.  Mail and electronic communications were used by defendants in furtherance of the scheme. Defendants' use of mail and electronic communications in furtherance of their scheme of fraud violated 18 U.S.C. 1341 and 1343.

C.  On information and belief, some of the acts of mail and wire fraud consisted of communications between defendants, or between defendants and the IME "cut off" doctors whose reports defendants relied upon in terminating or denying plaintiffs' benefits, or between defendants and their workers compensation defense attorneys; plaintiffs do not have these communications.  On information and belief, DHL, National Union, Cambridge, SRS and Sedgwick relied on their Michigan workers compensation attorneys to identify cut off doctors; those attorneys communicated by mail and wire with DHL, National Union, Cambridge, SRS and Sedgwick the tactic of using doctors who could be relied on to write a report that would state a worker did not have a work-related disability regardless of the facts, and the attorneys gave to DHL, National Union, Cambridge, SRS and Sedgwick the name and contact information for such doctors, such as Drs. Paul Drouillard, Emmanuel Obianwu, Asit Ray, Jeffrey Lawley and Philip Mayer.  In these communications, DHL, SRS,

Cambridge and Sedgwick and perhaps their attorneys discussed means - such as using cut off doctors like Drs. Drouillard, Ray, Lawley, Mayer and Obianwu - of cutting off plaintiffs' benefits or forcing them to take settlements at less than true value, even though DHL, National Union, SRS and or Sedgwick possessed medical reports from treating doctors and doctors chosen by defendants stating plaintiffs did have work-related disabilities. These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

D. Sedgwick, DHL, Cambridge, SRS and National Union chose Drs. Obianwu, Mayer and Drouillard to examine scores or hundreds of workers compensation claimants in the last 10 years, in Michigan workers compensation cases involving both DHL and other companies. They may have been advised to do so by their Michigan workers compensation defense attorneys. They intended to use these physicians because they knew or were told they were "cut off" doctors - physicians who could be relied on to always or nearly always state a claimant did not have a work-related disability. These defendants intended to select examining doctors who could be relied upon to favor them rather than to honestly, fairly and accurately determine whether a worker was disabled and had work-related pathology; these acts violated their duties under MUTPA, identified elsewhere in this complaint, and was part of their fraudulent

scheme in violation of RICO.    In all cases, the choice of Drs. Drouillard, Ray, Obianwu, Lawley and Mayer was made by defendants and or their attorney, Mr. Felker, not to get an independent, fair and impartial assessment of plaintiff's claim of disability and whether that disability was work related, but to get a report which defendants and or Mr. Felker knew with near certainty would favor defendants and find no work-related disability.

22.   Dr. Drouillard has repeatedly testified in workers compensation cases involving the plaintiffs in this case and other persons that "independent medical examinations" (IMEs) and related depositions are "10 to 15% of my practice," but that testimony was false because IMEs and related depositions either comprised substantially more than 10 to 15% of his earnings or substantially more than 10 to 15% of the time he spent in his practice (earning money from the practice of medicine and doing IMEs and depositions).   From 2003 through 2008 he did about 1,100 examinations per year.   He did IME examinations concerning spine conditions, though he did not practice in the area of spine conditions.

23.   Defendants' fraudulent scheme was accomplished by use of the United States mails and by electronic communications in violation of 18 U.S.C. 1341 and 1343.   These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

24.   Drs. Drouillard, Ray, Lawley, Prasad and Mayer,as part of a RICO enterprise or by their association with one of the RICO enterprises alleged above, violated 18 U.S.C. 1962(c) in that they participated in the conduct of the enterprise's affairs through a pattern of racketeering activity, and proximately injured plaintiffs as alleged herein.    Their illegal conduct is described in throughout this complaint.

25.   DHL, Cambridge, SRS and Sedgwick, not as the RICO enterprise but by association with one of the RICO enterprises alleged above, violated 18 U.S.C. 1962(c) in that they participated in the conduct of a RICO enterprise's affairs through a pattern of racketeering which proximately injured plaintiffs, making DHL, SRS and Sedgwick liable to plaintiffs for damages, except where they have been released by a plaintiff. Personnel at Sedgwick, such as LaTara Lewis, violated 18 U.S.C. 1962(c) in that they participated in the conduct of a RICO enterprise's affairs through a pattern of racketeering which proximately injured plaintiffs, making UPS and Liberty liable to plaintiffs for damages, except where they have been released by a plaintiff.  The allegations of this paragraph are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

26. DHL's, Cambridge's, SRS'sand Sedgwick's southeast Michigan workers compensation attorneys may have participated in the scheme by using the mails and

wires to (1) identify for DHL, Cambridge, SRS and Sedgwick Dr. Drouillard and the other doctors as physicians who could be relied upon to lie for defendants and write a report stating a claimant did not have a work related disability regardless of the true facts, (2) to advise DHL, Cambridge, SRS and Sedgwick to defend and delay the claim despite knowledge that a claimant had presented proof of a valid workers compensation claim and that there was no reasonable ground for further defense and delay of the claim, and (3) to defend and delay the workers compensation claim despite knowledge that a claimant had presented proof of a valid workers compensation claim and that there was no reasonable ground for further defense and delay of the claim.  The allegations of this paragraph are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

27.   It was the policy of Cambridge, SRS and Sedgwick to describe the examinations by doctors hired by it as "independent medical evaluations."   These statements were false and known to Cambridge, SRS, Sedgwick, DHL and their attorneys to be false, because the examining doctors were chosen by defendants or their attorneys, paid by defendants, and made large sums of money doing examinations for defendants; they were chosen because defendants and or their attorneys knew these doctors could be relied upon to find no work-related disability,

regardless of the truth.

28.   DHL, Cambridge, SRS and Sedgwick are liable to plaintiffs under respondeat superior and vicarious liability insofar as they have profited or benefitted from their employees' or agents' violations of 18 U.S.C. 1962(c), enterprise.

28A.   In December 2008 and January 2009, DHL laid off about 90% of its United States union work force.  In the following months, DHL and Sedgwick have acted to cut off benefits of the majority of persons still receiving workers compensation; on information and belief, this wave of cutoffs was deliberate attempt to evade the defendants' workers compensation obligations regardless of the merit of the workers' claims.

29.   **Conspiracy.  (18 U.S.C. 1962(d)).**  By means of the actions described in the complaint, each of the defendants conspired to violate 18 U.S.C. 1962( a through c), and conspired with one or more of the other defendants, and or the employees of DHL, Cambridge, SRS and Sedgwick, and or with other persons, to violate 18 U.S.C. 1962(a through c).  DHL, Cambridge, SRS and Sedgwick, through the actions of their employees involved in the handling of Michigan workers compensation claims, and Drs. Drouillard, Lawley, and Mayer agreed to participate in the commission of the predicate acts which are alleged in this complaint.   These employees of DHL, Cambridge, SRS and Sedgwick, and their southeast Michigan workers compensation

defense attorneys and agents, knew these doctors and other "independent medical examiners" wrote reports which were used to deny or cut off workers compensation benefits, and knew these doctors and other "independent medical examiners" were doctors who could be relied on to write a fraudulent report - finding a workers compensation claimant had no work-related disability regardless of the truth - yet these employees and persons agreed with the doctors for these doctors to act as "independent medical examiners," writing examination reports and doing depositions which found no work-related disability regardless of the truth.  DHL, Cambridge, SRS and Sedgwick agreed with the doctors to hire them to make fraudulent reports and give fraudulent depositions.  DHL, Cambridge, SRS, Sedgwick and their southeast Michigan workers compensation attorneys used the reports and depositions  to cut off or deny benefits, or to settle a claim for less than its true value due to the fraudulent reports and depositions of these doctors and other fraudulent independent medical examiners, knowing that the mails and wires would be used in furtherance of this fraudulent scheme.  These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.  Such actions of conspiracy proximately caused or contributed to plaintiffs' damages, as a result of which defendants are liable to plaintiff under section 1962(d).

30. **Aiding and Abetting.**  DHL aided and abetted the predicate acts

committed by the other defendants, because (1) Cambridge, SRS and Sedgwick acted as agent for DHL, and the actions of its agent are attributable to DHL, and (2) on information and belief, employees of DHL knew of the predicate acts planned by the defendants on behalf of DHL and permitted them to take place by silent or express approval, and by failing to stop the pattern of racketeering though it had knowledge of same.    DHL, Cambridge, SRS and Sedgwick, through the actions of their employees involved in the handling of Michigan workers compensation claims, and the physician defendants Drouillard, agreed to participate in the commission of the predicate acts which are alleged against them in this complaint.  These employees of DHL, Cambridge, SRS and Sedgwick knew Drs. Mayer, Lawley and Drouillard and other "independent medical examiners" wrote reports and gave depositions which were used to deny or cut off workers compensation benefits, and knew these doctors and other "independent medical examiners" could be relied on to write a fraudulent report - finding a workers compensation claimant had no work-related disability regardless of the truth - yet these employees agreed to the use of these doctors and others as "independent medical examiners," and to the use of their report to cut off or deny benefits, or to settle a claim for less than its true value due to the fraudulent reports of these doctors and other fraudulent independent medical examiners, knowing that the mails and wires would be used in furtherance of this fraudulent scheme.  The

identities of the DHL, Cambridge, SRS and Sedgwick  employees and the dates of

their actions and the dates they learned of or committed the planned predicate acts are

not known to plaintiff, except for Samantha Minehart of Cambridge and LaTara Lewis

of SRS.   Drs. Mayer, Obianwu and Drouillard aided and abetted the predicate acts

committed by LaTara Lewis and other employees of SRS and Sedgwick or their

lawyers by (1) communicating with them personally or through agents to set up the

so-called "independent medical examinations," and the depositions of the doctors in

workers compensation litigation (these communications, if by mail or wire, are also

acts of mail and wire fraud by these defendants), and (2) by doing those exams and

depositions to aid DHL's, Cambridge's, SRS's and Sedgwick's goal of cutting off or

denying benefits.  The allegations of this paragraph are based on information and

belief, and are likely to have evidentiary support after a reasonable opportunity for

investigation and discovery.

31. **Continuity.**

A.  The scheme to defraud injured workers of their workers compensation

benefits was carried on by defendants, including each of the doctors sued herein, for

a period of at least 6 years, involving dozens of acts of mail and wire fraud in

furtherance of that scheme; these acts of fraud continue at this time (July  2010) and

therefore appear highly likely to continue into the future.

The scheme was a regular way of doing business for defendants, even though defendants DHL and its insurers and TPAs did not defraud each and every claimant of workers compensation benefits for each and every injury.    The pattern of fraud was so persistent and widespread as to constitute a regular way of doing business. The scheme and predicate acts complained of herein continued over at least six years beginning in 2003, if not earlier, and will continue into the future unless defendants stop their illegal acts.

B. **Other Predicate Acts By The Doctors and TPAs for Other Employers/Insureds**.   The doctors and TPAs sued herein committed acts of mail fraud for workers compensation insurers and self insurers other than the entities sued herein.  For example:

### Predicate Acts by Dr. Drouillard

(1) Dr. Drouillard wrote a report on UPS employee Shawne Henry, which he mailed to Liberty Mutual In Indianapolis IN, from Garden City or Westland MI, on January 24, 2007, in which he fraudulently described the exam that he did and fraudulently concluded plaintiff had no work-related disability.

(2 ) Dr. Drouillard wrote a report concerning Christine Singleton, a UPS

employee, which he mailed Dec. 28, 2007, from his Westland or Garden City office to Liberty Mutual in Indianapolis IN, as part of a scheme to fraudulently deprive Mrs. Singleton of her workers compensation benefits, in which he fraudulently described the exam that he did and fraudulently concluded plaintiff had no work-related disability.

(3)   Dr. Drouillard wrote a report concerning John Miller, a UPS employee, which he mailed Oct. 14, 2005, from his Westland or Garden City office to Liberty Mutual in Indianapolis IN, as part of a scheme to fraudulently deprive Mr. Miller of his workers compensation benefits, in which he fraudulently described the exam that he did and fraudulently concluded plaintiff had no work-related disability.

(4)  Clifton E. Jackson was employed by Coca Cola when on 9/17/2007 he injured his lumbosacral spine.   He was treated thereafter by Dr. Shlomo Mandel of the Henry Ford Hospital system, a specialist in treating the low back.   Dr. Mandel determined that plaintiff has been disabled by his work-related back injury from 9/2007 to the present, and continuing.   In May 2008, Sedgwick required plaintiff to attend an "independent medical examination" by Dr. Terry Weingarden, paid for by defendants.  Dr. Weingarden opined that plaintiff was disabled by his

work-related injury.  Sedgwick later had plaintiff examined again by Dr. Weingarden, and again he opined plaintiff was disabled.   Despite these opinions, on Jan. 6, 2009, LaTara Lewis of Sedgwick mailed plaintiff a letter stating, "I have scheduled an Independent Medical Evaluation for you with Dr. Drouillard on Jan. 14, 2009...."  The letter was fraudulent in that Dr. Drouillard was not an "independent" doctor but was hired and paid by Segwick, not by a person or entity with no financial stake in the outcome of plaintiff's claim; in that Drouillard was paid by Sedgwick and other workers compensation insurers hundreds of thousands of dollars to examine Mr. Jackson and other workers compensation claimants; in that Dr. Drouillard participated in a scheme to fraudulently and dishonestly deprive plaintiff and, on information and belief, thousands of other workers compensation claimants of their workers compensation benefits.   Furthermore, Dr. Drouillard is not a back surgeon; he does surgeries on knees, shoulders and other joints, but not the LS spine.   On or about Jan. 6, 2009, Dr. Drouillard violated  18 U.S.C. 1343 (wire fraud) when in a phone conversation and or a facsimile communication from his office in Garden City Michigan with LaTara Lewis of Segwick CMS at her office in Chicago, IL, he

conspired to conduct a fraudulent examination of Clifton Jackson, in which he would conclude, regardless of the facts, that Mr. Jackson had no work related disability.     Dr. Drouillard mailed a report of his examination dated Jan. 14, 2009 to Sedgwick, and Sedgwick mailed or emailed a copy to plaintiff; these were acts of mail fraud.   The report contained lies:

(A) Dr. Drouillard stated plaintiff said his pain "is not actually the right leg," which is false, because plaintiff told the doctor he did have pain down the right leg.

(B) Dr. Drouillard stated, "He tells me he gets numbness and tingling in the right buttock that occurs sometimes, but he is not sure when he last had it."  This statement was false, because plaintiff told the doctor he had had pain, numbness and tingling in the buttock the night before the exam.

(C) Dr. Drouillard stated, "Overall, he thinks his pain is getting better."  Plaintiff never made this statement.

(D) Dr. Drouillard stated "he [Mr. Jackson] is willing to forward flex 70 degrees,"  which statement was a lie, in that Mr. Jackson could not forward flex anywhere near 70 degrees.

(E)  Dr. Drouillard stated, "There are thick calluses in the palms over both hands, over the fourth metacarapal heads suggestive of ongoing manual labor despite his historical account."   This statement was a lie; plaintiff did not have calluses.

(F)   Dr. Drouillard stated he reviewed an MRI of the LS spine and said, "There is no evidence of disc herniation in my opinion." This opinion was fraudulent; it was not within the reasonable range of medical opinion and was made as part of a scheme to assist insurers in depriving plaintiff and others of their workers compensation benefits by writing examination reports that insurers could use to cut off or deny benefits.

(G)   Dr. Drouillard stated, "I feel he can return to work unrestricted...."   This opinion was fraudulent; it was not within the reasonable range of medical opinion and was made as part of a scheme to assist insurers in depriving plaintiff and others of their workers compensation benefits by writing examination reports that insurers could use to cut off or deny benefits.

(H)  In reliance on Dr. Drouillard's report, Sedgwick cut off benefits, proximately injuring Mr. Jackson.

## Predicate Acts by Dr. Lawley

**(1)     On Behalf of UPS.**

**(A)  Terry Mack v UPS.**  Dr. Lawley committed predicate acts of mail fraud in the Michigan workers compensation case of Terry Mack v UPS.   This fraud included mailing a fraudulent IME report on or about 1/26/2010 to UPS in Michigan and Liberty Mutual in Indian; the report concluded plaintiff's rotator cuff damage was caused by age-related degeneration, but totally failed to mention Mack's labral tear, and failed to review the photos taken during arthroscopy in 2009 of the rotator cuff pathology, which in the opinion of the treating surgeon clearly showed traumatic tearing of the labrum and a high grade traumatic tear of the rotator cuff.  The fraud included failing to state that Mr. Mack's 24 years of repetitive heavy over head lifting at UPS was a likely or possible cause of the rotator cuff degeneration.   It may have included failure to mention the labral tear.

Dr. Lawley committed a predicate act of mail fraud in his report dated 4/29/10 and mailed to UPS and Liberty Mutal in Michigan and Indiana on or about that date when he stated Mr. Mack could return to work without restriction; this was fraud because Lawley knew Mr. Mack had had shoulder surgery on 11/2/09 but did not know what pathology was found in surgery or what surgical procedures had been performed, and he knew Mr. Mack had had a rotator cuff tear.  In these circumstances

the statement that Mr. Mack could return to work without restriction was fraud.

**(B)  Marlene Dysert v UPS.** Dr. Lawley committed another predicate act of mail fraud in the UPS/Liberty Mutual case of Marlene Dysert, in a report dated 12/10/09, and mailed by him or his agent to UPS and Liberty; the report found no work-related knee pathology; the report was fraudulent, inter alia, in that (1) the doctor did not perform the physical examination he claimed he performed (for example, he claimed he stressed the left knee, when he did not; he claimed he performed many tests and observations on the knees, but he spent only 3 minutes and 20 seconds in his examination; he failed to perform a standard diagnostic test or tests), (2) his opinions were intended to be biased and false (for example, his opinion that she could return to very heavy and strenuous work without restriction).  Dysert's surgeon, Dr. Kyle Anderson, examined her four days later and disabled her due to pathology he found during his examination (he had previously done surgery on Dysert); Dr. Anderson authorized an MRI which was done in 2/2010, which found re-tear of the ACL at the superior attachment, and femoral condyle pathology requiring rescoping of the knee and possibly joint replacment; plaintiff did nothing between the date of the Lawley exam and either the 12/14/2009 Anderson exam or the 2/2010 MRI to cause the pathology found on the exam or the MRI.

Supporting the conclusion that Dr. Lawley committed fraud is his pattern of

finding only age-related degeneration in the vast majority of his knee, low back and shoulder injury IMEs for Sedgwick, Liberty, etc; his finding of no disability in these cases; and the finding of work-related disability by the claimants' treating physicians.

On information and belief, each of the claim adjusting service companies (Cambridge, SRS, Sedgwick) was involved in the scheme and committed predicate acts during the period of time they were hired by DHL and or its insurers to be the claims adjusting service. Plaintiffs do not know the exact periods of time during which each adjusting service adjusted claims for DHL and its insurers; this information is in the possession of DHL and the insurers. Plaintiffs do not know whether these adjusting service companies were hired by DHL or by National Union or New Hampshire; this information is in the possession of DHL and its insurers. The allegations of this paragraph are based in part on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

With regard to Drs. Drouillard, Ray, Mayer, Prasad and Lawley, their pattern of racketeering involved at least dozens and as many as several thousand predicate acts, each, over the last 10 years, in that they each performed each year dozens (Ray, Prasad) or hundreds or thousands (Drouillard, Lawley, Mayer) of IMEs for all or many of the past ten years, and it was their regular practice and intent not to be fair,

unbiased and independent of the insurers and employers which paid them.  Predicate acts by Dr. Ray involving other insurers and employers included his report and testimony in the Michigan workers compensation case of Timothy Moon; on or about April 8, 2004, Dr. Ray, in Warren, Michigan, mailed via the U.S. mail to the Michigan Tooling Assn Service Fund in Farmington Hills, Michigan, the report of his April 8, 2004, medical examination of Plaintiff, which report fraudulently stated that Mr. Moon was no longer disabled due to a work-related condition.

32.  **Ripeness.**   Each claim is ripe because upon cutoff or denial of benefits, each plaintiff immediately suffered one or more of the following financial losses:

a.  loss of weekly benefits;

b.  loss of urgently needed medical care because defendants refused to pay for it;

c.   medical bills for treatment done before and after cutoff/denial, which remain unpaid but are the debts of the injured worker because the insurer refused payment;

d.   medical bills which plaintiffs paid for before and after denial/cutoff, which defendants refused to repay plaintiffs for.

The amounts of weekly benefits lost and medical bills unpaid are determinable immediately; as each week of cut off or denial continues, the amount in controversy grows.

The cutoff or denial of benefits forces a person to either abandon his claim, or

litigate by filing a claim with the Agency. Litigation takes up to 15 years. The length of litigation depends on the number of appeals to the Workers Compensation Appellate Commission and the Michigan Appellate Courts, and the number of remands for further findings, before a final order is entered. If a person waits until liability is finally determined by a final order, he may have to wait 15 years.

Thus, a wrongful cutoff or denial defeats the aim of the WDCA: "....the delivery of sustaining benefits to a disabled employee as soon as possible after an injury occurs....to provide the disabled worker with benefits *during* the period of his disability so that the workers and his dependents may survive (literally) the catastrophe which the temporary cessation of necessary income occasions..." *McAvoy*, supra.

33.      **Allegations Relevant to Equitable Tolling and the Statute of Limitations.**   At the time a defendant insurer/claim adjuster/employer cut off or denied benefits, or a defendant physician wrote an examination report or gave a deposition, none of the plaintiffs had notice sufficient to prompt them to investigate a RICO claim, or nor could they have discovered the basis for a RICO claim despite reasonable diligence, because, inter alia, essential facts constituting the scheme to defraud and the elements of a RICO cause of action were within the exclusive possession of defendants, including such facts as the policies and decisions of the

defendants concerning when a claim was to be cut off or disputed; when and which physicians were to be used for so-called independent medical examinations (IMEs); the number of times defendant physicians were used for IMEs; the reasons why defendant physicians were selected by defendant insurers/employer/claim adjusters; the percentage of times the IMEs were favorable to the employer/insurer/claim adjuster defendants; communications involving insurers/claim adjusters, employer, and workers compensation defense counsel in furtherance of the scheme to defraud; Furthermore, defendants wrongfully concealed facts needed for discovery of a RICO action, such as the existence of the scheme to defraud involving the defendants doctors, as a result of which the operative facts of a cause of a RICO action was not discovered by a plaintiff until after four years before this suit was filed.  Also, a plaintiff who was the victim of a single predicate act had no cause of action until a second predicate act was committed by defendants against him or her, or against another victim if RICO case law so holds.   The conduct of the employer/insurers/claims adjuster defendants in continuing to deny a plaintiff's claim continued during negotiations for settlement and up to the date of redemption (settlement) of a workers compensation claim, and because a settlement occurred in whole or in part because these defendants continued to fraudulently deny liability, a cause of action accrued each time said defendants continued to deny liability based

on a fraudulent IME, up to the date of settlement. Because of equitable tolling and or the principles applicable to the accrual of a RICO cause of action, the RICO statute of limitations does not bar a plaintiff's claim for an act by a defendant occurring more than four years before the filing of this suit. These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

## THE PATTERN OF RACKETEERING AND THE CLAIMS
## OF EACH PLAINTIFF

34. The pattern of racketeering and some of the particular means of achieving this fraudulent scheme which are known to plaintiffs at this time are described below plaintiff by plaintiff (paras. A and B). These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery; for example, precise dates of mailing or faxing or emailing among defendants or their agents are known to defendants and not plaintiffs. These allegations describe a pattern of racketeering spread over several years, continuing in the present and likely to continue into the future. Defendants used mail and electronic communications in furtherance of their scheme to defraud, violating 18 U.S.C. 1341 and 1343. With regard to each plaintiff, DHL, National Union, Cambridge, SRS and Sedgwick or their agents used the mails and wires at least five times in furtherance of the scheme to deprive a plaintiff of his or her workers

compensation benefits: (1) mailing by Sedgwick or SRS from their offices a notice to the plaintiff to appear for an "independent medical examination" with Dr. Drouillard or Mayer; (2) mailing or faxing or phoning by Sedgwick or SRS to Dr. Drouillard in Garden City, MI, or to Dr. Mayer in Livonia or Northville MI, the notice that a plaintiff would appear before him for the exam; (3) mailing or faxing by SRS or Sedgwick or its agent from its office the report to the plaintiff to National Union, DHL and the Michigan workers compensation defense attorneys; (4) mailing the Notice of Dispute by Sedgwick or SRS from their office to the Agency in Lansing Michiganand to the plaintiff. The persons who engaged in the pattern of racketeering are, in addition to the named defendants, the individuals at the Sedgwick, SRS, National Union and DHL workers compensation claims departments who handled Michigan workers compensation claims. The dates of some of these mailed, emailed or faxed communications are within the possession of defendants. DHL's workers compensation attorneys may have participated in the scheme by using the mails and wires to (1) identify for DHL, Cambridge, Sedgwick and SRS Drs. Drouillard, Mayer, Obianwu and other doctors as physicians who could be relied upon to write a report stating a claimant did not have a work related disability regardless of the true facts, (2) to advise DHL, Cambridge, SRS, National Union and Sedgwick to defend and delay the claim despite knowledge that a claimant had presented proof of a valid

workers compensation claim and that there was no reasonable ground for further defense and delay of the claim, and (3) to defend and delay the workers compensation claim despite knowledge that a claimant had presented proof of a valid workers compensation claim and that there was no reasonable ground for further defense and delay of the claim.  The allegations of this paragraph are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

34. A. RANDALL PIERSON

(1) Randall Pierson was employed by DHL and its predecessor Airborne as a deliveryman (driver) dockworker since 1991.

(2) On or about May 30, 2000, he injured his low back at work for Airborne but continued to work, then on June 3, 2000, after lifting packages at work and twisting, he experienced severe pain in his low back.  He was treated conservatively (non-operatively) for many months, and returned to work for some time, until his pain and pathology let Drs. Lawrence Kurz and Philip Friedman to perform a fusion with instrumentation at L4-S1.  Mr. Pierson returned to full duty in the fall of 2001 and continued working full duty until 2005.

(3)   In November 2005, he lifted a 50-60 pound box at work for DHL and experienced low back pain radiating to the left side and groin.

(4) DHL, National Union and Cambridge paid workers compensation for Mr. Pierson's low back pathology until March 28, 2006.

(5) On or about March 10, 2006, Cambridge, as claims adjuster, mailed from its office in Downers Grove IL to plaintiff at his residence in Warren Michigana notice to report to Dr. Philip Mayer for an "independent medical exam." The notice was fraudulent because the exam was not independent, and because Dr. Mayer was employed as a cut off doctor and not to give a truly fair, unbiased, impartial and independent exam, as plead elsewhere in this complaint.   This mailing and the other mailings and electronic communications referred to in the following paragraphs by Dhl employees, Minehart and Dr. Mayer were predicate acts of mail and wire fraud used in furtherance of a scheme to defraud, in violation of 18 U.S.C. 1961, et seq. These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

(6)   Dr. Mayer reported in a letter mailed March 15, 2006, from his office at Tri County Associates at 32410 W. Five Mile Rd, Livonia Michigan48154 to Cambridge in IL, that he performed an "independent medical examination."  This statement was false for reasons stated elsewhere in this complaint, including that the relationship between Dr. Mayer and the other defendants was not independent because of the large amount of money Dr. Mayer received each year from defendants and other

66

insurance companies to do examinations in workers compensation cases.      (7) Dr. Mayer's report falsely stated (a) that Mr. Pierson told him "that while in the Air Force as an air freight load master he said his back went out a few times and would lock up"; he told Dr. Mayer he had a sore back at times and once it almost felt like it wanted to lock up; (b) on page 2 fifth par, "he denies lower extremity symptoms," but Mr. Pierson did state pain would at times radiate into the left buttock and slightly down the left leg; (c) fourth page, para five under SUMMARY/IMPRESSION, "Mr. Pierson..... long history of back problems dating back to his Air Force career....."; this was false because Mr. Pierson told Dr. Mayer only of occasional sore back while working for the Air Force.

(8) Dr. Mayer's report falsely states page 5 para 5, "Based on my evaluation, I can find no  objective reason to restrict him from returning to his prior activity levels"; this statement was false because Dr. Mayer knew that Mr. Pierson might have a non-fusion at L4-S1 (knew that Pierson might not have a solid arthrodesis), knew that he needed to review radiographs to determine if there was a solid arthrodesis/fusion, and knew that a non-fusion/non-solid arthrodesis was an objective reason to disabled Mr. Pierson from returning to his prior activity levels, which involved lifting, twisting and bending throughout the work day, including packages up to 75#.

(9)   Dr. Mayer's March 2006 report was deliberately misleading concerning the work-relationship of the possible fusion failure.   He knew that the 2001 fusion was, by history, work-related, because it was the result of the work incident in 2000, but did not say so in his report; he admitted this work-relationship in his deposition of Dec. 7, 2006.   Because he knew the 2001 fusion was by history work-related, he knew the fusion failure was work-related to some degree, even if plaintiff's smoking contributed greatly to the failure.   Dr. Mayer's omission in his report of a statement that the fusion failure was related by history to the 2000 work incident was deliberate and made with intent to assist Cambridge and DHL in cutting off benefits; he knew that statement in his report that he could find no work-relationship between the fusion failure and a work incident in November 2005 would be relied upon by Cambridge and DHL to cut off benefits; he knew that if the fusion was due in part to the 2000 work incident, and he said so in his report, then workers compensation benefits would be owing in 2006 for the failure of the fusion.

(10)   This report was also mailed, emailed, and or faxed by Dr. Mayer and or by Minehart at Cambridge, on or about 3/17/06, to Brenda Prisza of DHL.   The mailing, faxing and emailing of this report were predicate acts.

(11) On March 17, 2006, Brenda Prisza of DHL in Michigan emailed to DHL Worker's Compensation Manager James Sirles in Runnemede, NJ:

68

Jim,

I could use some assistance with this claim. Randall Pierson off OJI 11-23-5 claim number 542353-1. Randall was scheduled to have surgery on his back March 29, 2006, but the doctor determined that **his case was a previous injury** and Cambridge is now denying the claim. Randall tells me that he first hurt his back working for Airborne and was off on OJI April 2001 (he is not sure of the dates). The carrier at the time was Kemper. I will try to find the old files; Randall's history in PeopleSoft does not show him off on OJI at that time. Any guidance you can provide would be  greatly appreciated. Brenda [emphasis added]

Worker's Compensation Manager Sirles replied by email on 3/18/06:

Check your OSHA 200 files for 2001 and see if an injury was reported.

Brenda replied to Sirles on 3/21/06 at 10:07:25 by email:

I did check through the old comp files and found the original paperwork for Randall's injury. The injury date was 5/23/00 and the Kemper claim number was 536 CE 128778. PeopleSoft does show Randall off on OJI during this time period.

(12) Some time that day, and before 15:22 hours, Prisza received an email from sone concerning the previous OJI.   This claim is based on the email Prisza sent out

69

at 15:22 (see next paragraph).

(13)    Despite being told that Dr. Mayer "determined that **his case was a previous injury** and Cambridge is now denying the claim, and knowing that a previous **OJI** (on the job injury) had occurred while working for DHL or its predecessor Airborne, Brenda Prisza and James Sirles denied the claim in full and or failed to authorize any medical or wage loss benefits.   On 3/21/06 at 15:22:54 - about five hours after emailing Mr. Sirles that Mr. Pierson had indeed suffered a previous OJI back injury - Brenda Prisza emailed to plaintiff a denial of the claim:

> Randy,
>
> This is an email (in part) that I received concerning your injury:
>
> *Mr. Pierson's previous claims are all settled.  An IME determined that the surgery he is scheduled for is not the result of the injury he suffered on Nov. 23, 2005.  If he has further questions, he can contact the Cambridge adjuster.*

(14).   Despite knowing of the earlier OJI injury involving the lumbosacral spine and knowing that Dr. Mayer determined that the 2006 need for surgery was related to the earlier injury or injuries, Cambridge and DHL did cut off benefits, citing Dr. Mayer's report.   After paying benefits for several months following the Nov. 2005 event, Samantha Minehart of Cambridge on March 22, 2006, mailed to Randall

Pierson in Warren, Michigan and faxed to Mr. Pierson at 248 647 1917, and to Dr.
Kurz in Southfield, Michigan at 248 663 1901, three letters enclosing Dr. Mayer's
report and denying workers compensation benefits.  Minehart stated, inter alia, "there
was no work related injury sustained," which was fraudulent, because a work injury
was sustained in June 2000 which resulted in the fusion and failed fusion.  In the
3/22/06 fax to Dr. Kurz, Minehart stated, "the ongoing  treatment and surgery is
necessary BUT NOT WORK RELATED." This was false and fraudulent, for reasons
stated.

(15)   Samantha Minehart of Cambridge mailed a Notice of Dispute, Agency
form WC-107, to the Agency in Lansing and to plaintiff on or about 8/4/06.  These
mailings were predicate acts of mail fraud because they were used in furtherance of
the scheme to defraud.  The Notice of Dispute disputed benefits, giving as reason
"further investigation required.  No proximate cause/injury alleged, pursuing updated
medical opinion on causation..... Need to investigate further."

(17) on or about March 23, 2006, plaintiff through his lawyer filed with the
Agency an Application for Mediation or Hearing requesting workers compensation
benefits due to the injury of Nov. 2005 or due to the earlier OJI injury to the LS spine.

(18) DHL and Cambridge, through their attorney T. Felker, fraudulently denied
the 2006 disability and need for surgery was work related, despite being told that Dr.

Mayer "determined that **his case was a previous injury"** and knowing that a previous **OJI** (on the job injury) had occurred while working for DHL or its predecessor Airborne. On or about July 11, 2006, Mr. Felker mailed to the Agency, as agent for the carrier, a Carrier's Response fraudulently denying the existence of a work related injury and disability, and to further the scheme.

(19) On or about Oct. 23, 2006, Dr. Kurz did surgery; he found a failed fusion and fused the failed fusion at L4-S1.  Mr. Pierson returned to work Dec. 2007.

(20)  On Nov. 28, 2006, Dr. Mayer mailed from Tri County in Livonia Michiganto Cambridge in IL a report which stated, inter alia, "I continue to believe that the pseudoarthrosis is not related to his work place incident."  He knew that if he stated in his the pseudoarthrosis was related to the 2000 work injury, then workers compensation benefits would be owed by DHL for that injury.  Dr. Mayer's omission in his report of a statement that the fusion failure was related by history to the 2000 work incident was deliberate and made with intent to assist Cambridge and DHL in cutting off and continuing to deny benefits; he knew that statement in his report that he could find no work-relationship between the fusion failure and a work incident in November 2005 would be relied upon by Cambridge and DHL to cut off and continue to deny benefits; he knew that if the fusion was due in part to the 2000 work incident, and he said so in his report, then workers compensation benefits would be owing in

2006 for the failure of the fusion.

(21)   On Dec. 7, 2006, DHL, New Hampshire Insurance Co, and Cambridge, through their attorneys, deposed Dr. Philip Mayer.   He testified:

> Q Would it be fair to say that the present condition then results, in part, from that injury of 1999 or 2000, given the history?
>
> A Well, if we make the assumption that the surgery was a result of that and I'm drawing the conclusion that the pseudoarthrosis is related to the surgery, which of course it is, because you can't have a pseuodarthrosis without having had surgery, then there's a relationship that goes back to the incident, if the incident is what caused the surgery.
>
> Q And as far as you know, from the history you took, it is reasonable to assume that the incident of May 1999 or May 30th 2000 did create the need for the first surgery?
>
> A Apparently so.  (Dep 60,61)
>
> ****
>
> Q Well, first of all, is this man disabled right now from unrestricted manual labor?
>
> A Yes.
>
> Q How long will he continue to be?

A It depends on the outcome from the surgery. [Referring to Oct. 2006 surgery] (Dep 60)

(22)   Despite this testimony by Dr. Mayer conceding that the need for the surgery was related by history to the injury at work in 2006, and conceding disability, Sedgwick, DHL, New Hampshire, and Cambridge continued to defraud plaintiff by failing and refusing to pay benefits, and by denying that the injury or disability was work related.

(23)   Predicate acts of mail fraud were committed by Cambridge, New Hampshire, and DHL on or about Dec. 31, 2006, when their agent and attorney T. F. Felker mailed from Birmingham Michigan to plaintiff's lawyer Marshall Lasser, po box 2579, Southfield Michigan 48037, and to the Michigan Workers' Compensation Agency, Lansing MI, an Amended Carrier's Response form stating "yes" in response to these questions:

"1. Do you dispute that the injury or disability is work-related?"

"2. Do you dispute that the claimant is disabled?"

Mr. Felker also mailed to the Agency and to Lasser, on or about the same date, a DEFENDANTS' AMENDED ANSWER which in paras. 2-4 denied in boilerplate pleadings that plaintiff was disabled and that his disability was work-related.  These mailings were fraudulent in that (1) defendants possessed the testimony of Dr. Mayer,

as well as the deposition testimony of Dr. Kurz taken on Nov. 17, 2006, and both doctors opined that plaintiff was disabled and that the disability was due to the work injury of 2000, and (2) defendants knew of the earlier work-related injury to the L4-S1 spine. These mailings were predicate acts of mail fraud.  These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

(24)  Despite the reports of Dr. Mayer, DHL and its TPAs continued to pay benefits to plaintiff until Dec. 10, 2009, during the periods of time in 2007-09 that plaintiff was unable to work due to the condition of his LS spine.  Plaintiff worked light duty and full duty at various dates from 12/2007 to 9/2008, missing various period of work due to low back pain, then in 9/08, he stopped work because of low back pain, and has not worked since.

(25)  On or about Sept. 25, 2009, Sedgwick by electronic communication from Lexington KY requested Tri County Associates of Medicine in Livonia Michiganto set up a medical examination with Dr. Philip Mayer.  This was a predicate act of wire fraud by Sedgwick because it was used in furtherance of the scheme to defraud plaintiff of his benefits.   Sedgwick on or about that date mailed a check to plaintiff for the mileage to and from the exam; this mailing was a predicate act of mail fraud in furtherance of the scheme to defraud.

(26)   On Nov. 6, 2009, Dr. Phillip Mayer mailed a report from Livonia Michiganto Sedgwick at Lexington KY, as requested by Sedgwick; this mailing was a predicate act of mail fraud in furtherance of the scheme to defraud.  Dr. Mayer's determination that plaintiff was able to work without restrictions was not a fair, honest, and independent determination, but was fraudulent in that it was made with the intent of favoring the insurance company and claim adjuster.

(27) Dr. Mayer fraudulently stated in his report that plaintiff was "referred for the purposes of an independent medical examination...."  This statement was fraudulent for reasons stated in para. 19.

(28) In reliance on this report, Sedgwick, through Judith Marshall in or near Troy, MI, and on behalf of DHL, mailed to the Agency in Lansing Michiganand to plaintiff in Warren MI, on or about Dec 1, 2009, a Notice of Dispute stating, "Deny further benefits are owed.  Dr. Phillip Mayer's IME report of 11-5-09 gives a full release."   These were acts of mail fraud.  The report was fraudulent, and Sedgwick knew that it was not an "independent" report for reasons stated in paras. 15-19; also, Sedgwick hired Dr. Mayer not because he was independent of bias or financial dependence on the insurance industry, but just the opposite - Sedgwick hired Mayer because he was known to deny in almost all reports that a worker had a work-related disability; he was known to Sedgwick and or its Michiganwork comp attorneys to be

a reliable "cut off" doctor.  These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

(29) On or about Nov. 6, 2009, and Dec. 16, 2010, Dr. Mayer was hired by the employer/insurer/claim adjuster defendants, using the mails and or wires, to report on plaintiff and he did write reports of that date, and on Jan. 14, 2011, gave a deposition for use at trial against plaintiff, and in his reports and deposition he acted in furtherance of the scheme to defraud by opining that plaintiff was not disabled and had no work-related injury.

(30) As of the date of this complaint, the employer/insurer/claim adjuster defendants continue to violate RICO in that they continue to use the fraudulent medical examinations and depositions of Dr. Mayer to deny and dispute plaintiff's claim.

(31) The fraud of defendants proximately caused plaintiff damages in that it impaired and damaged his claim for workers compensation, and because he had to hire and pay an attorney and to pay the expenses of litigation to recover his workers compensation benefits, and he lost benefits and the time value of those benefits due to the compromise of litigation and the delayed receipt of benefits.

(32) During the relevant time periods, New Hampshire and or National Union

77

insured the claims.

WHEREFORE, Randall Pierson seeks judgment of treble damages jointly and severally against defendants, plus attorney fees and costs as provided by 18 U.S.C. 1964, and by other statutes and court rules.

34 B.  NANCY LANDSKROENER

(1) At all relevant times, Nancy Landskroener was employed by DHL or its predecessor, Airborne Express, and or DHL Express USA Inc, in a job involving repetitive heavy lifting often while twisting and bending, and repetitive stepping in and out of vans and trucks while carrying freight, and pushing/pulling freight or containers of freight.   Paychecks were issued by DHL and not DHL Express.

(2) Plaintiff was injured working for DHL and or its predecessors on 10/13/05, 7/18/07, 10/07, and 12/8/08, suffering injuries to her cervical, lumbar and thoracic spine, and to her left elbow and wrist (occupational disease/injury also claimed).

(3) DHL and or New Hampshire Insurance Co, through Sedgwick, paid workers compensation benefits to plaintiff for the injury date of 12/8/08, when she slipped coming out of her delivery truck.

(4)  Plaintiff had a back injury in July 2001 while employed by DHL's predecessor, Airborne Express, and had an MRI at that time.   The workers compensation records for this injury were in the possession of defendants at all

relevant times; on Dec. 14, 2009, plaintiff was told by a workers compensation claim adjuster at Hartford Insurance Co, which insured Airborne for the 2001 injury date, that all records concerning the 2001 claim, claim no YCM 07010, had been given to Sedgwick at the time Sedgwick took over the DHL account.    However, at no time in 2008 or 2998 were the records of the 2001 injury, including the MRI, given to the "IME" doctors hired by defendants, or properly considered by defendants in assessing plaintiff's workers compensation claim in 2008 and 2009.

(5) After paying benefits for plaintiff's back injury, Sedgwick's claim adjuster in Troy, MI, on or about June 1, 2009, communicated by mail or email or fax or phone with Michigan Evaluation Group (MEG) in Southfield Michiganto set up a medical examination of plaintiff by Dr. Jeffrey Lawley.  This was a predicate act of mail or wire fraud, done in furtherance of the scheme to defraud described in paras. 15-27.

(6) On June 10, 2009, MEG mailed a letter to plaintiff in Belleville MI, stating, "An independent medical evaluation has been scheduled for you at the request of Belinda Belasco from Sedgwick Claims Management Service - Troy with Doctor: Jeffrey Lawley..."  This mailing was an act of mail fraud attributable to Dr. Lawley, DHL, New Hampshire, Sedgwick and Belasco, done to further the scheme.

(7) Dr. Lawley wrote a report dated June 25, 2009, which was fraudulent, in part because it stated on page 4, "she denies any bowel or bladder dysfunction,"

whereas plaintiff told Dr. Lawley that she urinated involuntarily when she fell on the Dec. 2008 injury date and since then has had leakage; he asked, "Do you wear diapers?" and she answered no. The report was also fraudulent for reasons stated above in pars. 15-27, and because Dr. Lawley concluded fraudulently that plaintiff had no work restriction due to her LS spine and no need for medical care for her LS spine.

(8) Dr. Phillip Friedman, a neurosurgeon selected by DHL's industrial clinic to examine plaintiff, concluded in June 2009 and afterward, that plaintiff needed medical care for her LS spine due to the Dec. 2008 injury and was disabled due to that injury.

(9) On or about Sept. 3, 2009, DHL, Sedgwick, Belasco, and New Hampshire, through their Michiganworkers compensation attorney T. Felker, mailed from Bingham Farms M I a Carrier's Response to the Agency in Lansing Michiganand to M. Lasser, Southfield MI, work comp attorney for Landskroener. The Carrier's Response fraudulently disputed that the injury on each of the injury dates alleged by plaintiff in her Application for Mediation or Hearing (12/8/08, 10/13/05, and 10/07) were work-related; defendants knew that the injury sustained on one or more of these alleged injury dates was work-related. The mailings of the Response form were predicate acts of mail fraud. These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

(10).  On or about Sept. 3, 2009, MEG mailed a letter to plaintiff in Belleville MI, stating, "An independent medical evaluation has been scheduled for you at the request of Belinda Belasco from Sedgwick Claims Management Service - Troy with Doctor: Asit Ray..."  This mailing was an act of mail fraud attributable to Sedgwick, Belasco, DHL, New Hampshire and Dr. Ray, done to further the scheme.

(11) On or about October 2, 2009, Dr. Ray mailed a report to Sedgwick in Lexington KY, attention: Belinda Belasco.  This was a predicate act of mail fraud by Dr. Ray, done in furtherance of the scheme.

(12) The employer/insurer/claim adjuster defendants continued to violate RICO up to the date of settlement in 2009/2010, in that they continued to use the fraudulent medical examinations and depositions to deny and dispute plaintiff's claim.

(13)  The fraud of defendants proximately caused plaintiff damages in that her workers compensation claim was damged; she had to hire an attorney and pay the expenses of litigation to recover workers compensation benefits, and lost benefits and the time value of those benefits due to the compromise of litigation and the delayed receipt of benefits.

WHEREFORE, Nancy Landskroener seeks judgment of treble damages jointly and severally against defendants, plus attorney fees and costs  as provided by 18 U.S.C. 1964, and by other statutes and court rules.

34 C. LONZIE RAYMOND

If Lonzie Raymond has released DHL, SRS and or the insurers, they are not sued by Raymond.

(1) Lonzie Raymond began employment with DHL or its predecessor Airborne in Nov. 1997. He was employed as driver dockworker. He injured his LS spine at work on or about 7/3/01 and 8/31/04, and also due to the duties of his occupation, which required repetitive heavy lifting with twisting and bending. DHL and its workers compensation insurer paid benefits until they cut them off based on an IME and report done by Dr. Drouillard.

(2) Dr. Drouillard gave a deposition on Sept 15, 2006. DHL, SRS, Sedgwick and or National Union and or their agents mailed or emailed the deposition to defense counsel and to each other in furtherance of the scheme to defraud; this was mail and wire fraud in violation of 18 U.S.C. 1341 and 1343. At or about that time, on information and belief, Dr. Drouillard used the telephone from his office in Garden City or Westland to call DHL, Sedwick, SRS or their agents to confirm the deposition; this was wire fraud in furtherance of the scheme.

(3) The deposition contained these lies (among others) by Dr. Drouillard:

1. Page 25 and 26: "Examination of the lumbosacral spine reveals his gait to be normal." In fact, Mr. Raymond was walking slow with a

visible limp.

2.   Dr. Drouillard states in his examination report that Mr. Raymond said, "I'm not trying to be an asshole."   That is a false statement; Mr. Raymond did not say that.

3.   Page 25: Dr. Drouillard states Mr. Raymond is "rather hostile, abusive and uncooperative."  That is a false statement.

4.  Page 25: Dr. Drouillard quotes Mr. Raymond as stating that after the 2001 injury "he got all better."   Mr. Raymond never said that.

5.   Page 27 Opinion: Dr. Drouillard states that in August 2004 "he remembers no specific injury." That is false, because Mr. Raymond told Dr. Drouillard that on August 31, 2004, he was working a p.m. shift making route stops, loading the truck, and as the shift progressed he felt more and more pain in his low back until in the middle of the shift he had to call management and seek medical attention.

6.  Page 27 Opinion: Dr. Drouillard states that Mr. Raymond refused to discuss his prior injuries.  That is false.  Mr. Raymond described his prior injuries.

(4)  In April 2009, Sedgwick, DHL, National Union and or their Michigan workers compensation attorney selected Dr. Philip Mayer to examine plaintiff and

sent plaintiff a letter directing him to appear at Dr. Mayer's office for an "independent medical examination."  The April 2009 letter mailed to plaintiff at his house in Michigan by these defendants or their agents directing plaintiff to appear for this exam was fraudulent in that the exam was not and was not intended to be an "independent medical examination," and was part of defendants' fraudulent scheme as described in paras. 19-23 of this complaint; it was a predicate act of mail fraud.

(5)  Dr. Mayer examined Mr. Raymond and on May 20, 2009, wrote a report. The May 20, 2009, report was fraudulent in that Dr. Mayer opined that Mr. Raymond had no objective abnormality giving rise to any need for restrictions of any kind from work despite the complaints of low back pain Mr. Raymond made at the time of the examination, Mr. Raymond's history of years of low back pain, his L5-S1 left sided disc herniation which impinged on the nerve root, his degenerative disc disease, the pain drawing he gave to Dr. Mayer at the time of the examination depicting sharp pain on the outside of the left foot (which Dr. Mayer fraudulently omitted from his report), despite Dr. Mayer's admission on page 81ff of his 9/17/09 depo that such foot pain could be evidence of S1 radiculopathy), and Dr. Mayer's possession of the 2001, 2004 and 2005 MRIs, which demonstrated significant pathology at L4-S1 consistent with Mr. Raymond's complaints, pain drawing and history of years of low back pain.  Dr. Mayer's opinion was also fraudulent for the reasons given in par. 19 above.  The

opinion that Mr. Raymond could work without restriction was also fraudulent because it was beyond the reasonable bounds of medical opinion of treaters of similar pathology who do not earn hundreds of thousands of dollars a year doing so-called independent medical exams;  even Dr. Drouillard testified at page 34 of his 2006 deposition that Mr. Raymond "did have MRI evidence of a small disc herniation and for that reason some restrictions were indicated that were prophylactic in nature. Avoidance of lifting more than 30 pounds and to avoid repetitive bending and twisting."   It was also fraudulent because it cited irrelevant facts and literature with the intent of deceiving the reader by making the report seem scientific and persuasive; for example by citing a study showing a 30% rate of "false positives" of MRIs of discs of patients who do not have symptoms, which study was irrelevant because Mr. Raymond did have symptoms.

(6)  On or about May 20, 2009, Dr. Mayer or his agent mailed and or sent by wire (faxed and or emailed) from Westland Michiganthe report of same date to Sedgwick Claims Mgt Services in Chicago, IL, or KY, at the request of Sedgwick, which was DHL's agent for claims handling; this was an act of mail fraud in furtherance of the scheme to defraud.

(7) After that date, the employer/insurer/claim adjuster defendants continued to violate RICO up to the date of settlement, in that they continued to use the

fraudulent medical examinations and depositions to deny and dispute plaintiff's claim, and they used the mails and wires on dates unknown to plaintiff and in the exclusive possession of defendants in furtherance of the scheme.

(8) The fraud of defendants proximately damaged plaintiff's workers compensation claim and caused plaintiff damages in that he had to hire and pay an attorney and to pay the expenses of litigation to recover his workers compensation benefits, and he lost benefits and time value due to delayed receipt of benefits.

WHEREFORE, Lonzie Raymond seeks judgment of treble damages jointly and severally against defendants (but if DHL, Sedgwick and insurers have been released, those parties are not sued by Raymond), plus attorney fees and costs as provided by 18 U.S.C. 1964, and by other statutes and court rules.

34 D. Sandra Goren

(1) Sandra Goren was employed by DHL and its predecessor Airborne Express since 1989, in a job involving repetitive heavy lifting often while twisting and bending, and repetitive stepping in and out of vans and trucks while carrying freight, and pushing/pulling freight or containers of freight.

(2) In or about Sept. 1995, plaintiff injured her left knee stepping out of a truck at work, and received workers compensation for that injury from DHL or its predecessor and the workers compensation insurer, including payment for two knee

surgeries and loss of time (indemnity) benefits.    Plaintiff returned to work full duty in 1997.

(3) In October 2003, while employed by Airborne or DHL, plaintiff injured her left knee while lifting up film cans in Ferndale, two 65# boxes.  She had surgery and returned to work in June 2004.   Thereafter, the left knee hurt increasingly over the years.

(4) On or about Jan. 7, 2009, she exited her truck at work and twisted left knee, felt pop and aching, and since then has been in severe pain.  She has degenerative arthritis of the left knee due in part to the 1995 and 2003 work accidents.  Those injuries to the left knee and subsequent work caused degeneration of the left knee, requiring surgery in 2009 and creating permanent disability from work.

(5) Despite knowing of the earlier injuries and surgeries, DHL, its workers compensation insurer, New Hampshire Insurance Company, and its TPA Sedgwick, themselves and or through its attorney, T. F. Felker, committed predicate acts of mail fraud on 1/29/09 when they mailed Notices of Dispute to the Workers Compensation Agency in Lansing Michigan and to Sandra Goren in Oak Park Michigan (stating "deny further benefits incident is idiopathic in nature"), and on or about July 7, 2009, when their agent and attorney T. F. Felker mailed from Birmingham Michigan to plaintiff's lawyer Marshall Lasser, PO Box 2579, Southfield, Michigan 48037, and to the

Michigan Workers' Compensation Agency, Lansing MI, CARRIER'S RESPONSE

forms stating "yes" in response to these questions:

"1.  Do you dispute that the injury or disability is work-related?"

"2.  Do you dispute that the claimant is disabled?"

This was fraud because defendants knew they did not have a reasonable basis to

answer "yes" to both questions.  Mr. Felker also mailed DEFENDANTS' ANSWER

which in paras. 2-4 denied in boilerplate pleadings that plaintiff was disabled and that

her disability was work-related.   These mailings were fraudulent in that defendants

knew from the records it possessed that plaintiff was disabled as of July 2009, and had

suffered work-related left knee injuries in 1995 and 2003 and had had three left knee

surgeries in 1995-2003, so that she had suffered traumatic arthritis to her left knee for

which benefits were owed by DHL and or its insurers.   These allegations are based

on information and belief, and are likely to have evidentiary support after a reasonable

opportunity for investigation and discovery.

(6) On or about Oct. 21, 2009, Marshall Lasser P.C .faxed to Mr. Felker records

and a note from Dr. Bolz documenting the 2003 knee injury and the fact that

plaintiff's 2009 condition was due to traumatic arthritis.  DHL and its agents knew

from records they possessed, and from these additional records, that the traumatic

arthritis in the left knee was due to traumas to the left knee which occurred during

88

employment with DHL and its predecessor Airborne, but DHL and its agents continued after Oct. 21, 2009, to deny work-relatedness of the left knee pathology, benefits and disability, using the mails and wires, which denial was fraudulent in light of the information DHL and its agents possessed.   These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

(7)   After that date, the employer/insurer/claim adjuster defendants continued to violate RICO up to the date of settlement, in that they continued to use the fraudulent medical examinations and depositions to deny and dispute plaintiff's claim, and they used the mails and wires on dates unknown to plaintiff and in the exclusive possession of defendants in furtherance of the scheme.

(8)   The fraud of defendants proximately damaged plaintiff's workers compensation claim and caused plaintiff damages in that she had to hire and pay an attorney and to pay the expenses of litigation to recover her workers compensation benefits, and she lost benefits and the time value of those benefits due to the compromise of litigation and the delayed receipt of benefits.

(9) During the relevant time periods, New Hampshire and or National Union insured the claims.

WHEREFORE, Sandra Goren seeks judgment of treble damages jointly and

89

severally against defendants, plus attorney fees and costs  as provided by 18 U.S.C. 1964, and by other statutes and court rules.

34 E.  Debra Poloskey

(1)  Debra Poloskey was employed by DHL or its predecessor Airborne Express since 1986,  in a job involving repetitive heavy lifting often while twisting and bending, and repetitive stepping in and out of vans and trucks while carrying freight, and pushing/pulling freight or containers of freight.

(2) Plaintiff injured her cervical spine while working for DHL on Dec. 20, 2006 and June 1, 2007 (on this date plaintiff returned to work but was unable to continue working due to the severe pain arising from her earlier injury).

(3)  DHL and or its insurer, New Hampshire Insurance Company, paid workers compensation benefits for a period of time, from Dec. 21, 2006 through May 29, 2007.

(4)   On or about May 14, 2007, DHL, New Hampshire, SRS and or Sedgwick mailed to Ms. Poloskey at her home in Newport MI, a letter directing her to attend an "independent medical examinaton" by Dr. Terry Weingarden, whom defendants and their Michigan workers compensation lawyers had hired dozens of times over the years to examine workers compensation claimants.   The letter mailed on that date to plaintiff by defendants stating the examination was "independent" was fraudulent because the exam was not intended to get a fair and impartial assessment of plaintiff

but intended to get a report either finding no disability or to greatly favor the employer, insurer and claims adjusting company, regardless of the facts.   Dr. Weingarden opined that plaintiff could work without restriction.

(5) Plaintiff returned to work for one day, June 1, 2007, and because of the continuing severe pain caused by her damaged and diseased cervical spine, was in severe pain and stopped working.  She has not worked since that date for DHL.

(6) In 2007 and 2008, plaintiff continued to treat with Drs. Alfredo Balarezo and Anne Abrahamson, both of whom opined in depositions that she was disabled from her job at DHL, which required repetitive heavy lifting up to 75#, and twisting and bending, and carrying weights up to 75# in and out of a delivery truck.   They testified she was disabled permanently from that job.  Dr. Balarezo, a practicing neurosurgeon, opined that the occupation  contributed in a significant manner to the cervical pathology, and Dr. Abrahamson opined that the injury or injuries at work contributed to the pathology.

(7)  On Sept. 25, 2007, T. F. Felker, attorney for defendants, mailed two letters to plaintiff at her home in Newport MI, on behalf of DHL, Insurance Company of the State of Pennsylvania, Laurie Dexter of SRS, directing her to appear for examination with Dr. Paul Drouillard.  Four other letters were mailed by Mr. Felker.  The choice of Dr. Drouillard was made by defendants and or their attorney, Mr. Felker, not to get

an independent, fair and impartial assessment of plaintiff's condition and whether it was work related, but to get a report which defendants and or Mr. Felker knew with near certainty would favor defendants, and would find no work-related disability. These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

(8) Dr. Drouillard examined plaintiff.  On or about October 12, 2007, he mailed to Laurie Dexter, SRS Services, Troy, MI, a report, stating, "At your request, Ms. Poloskey was seen in my office for an independent medical evaluation...."   This statement was false, in that the report was not independent, for reasons stated elsewhere in this complaint.

(9) In furtherance of the scheme to defraud, Dr. Drouillard wrote in his report that plaintiff had no physical restriction, and in his deposition given Jan. 14, 2008, he testified she had no physical restriction, and that her occupation did not contribute to the condition of her spine.

(10)   The defendant employer/insurers/TPA (Sedgwick), by themselves and through their workers compensation attorney, T. F. Felker, committed predicate acts of mail and or wire fraud on or about 5/30/2008 when they mailed to Magistrate Baril of the MichiganWorkers Compensation Agency in Detroit MI, to Marshall Lasser in Southfield Michiganand to Michael Mills in Bloomfield Hills Michigana letter to

which was attached Objections; a letter dated 11/19/2008 from Sedgwick to plaintiff in Newport MI; a letter from Felker dated 10/24/2008 to Lasser, and an email of that date of Norbel Marolla and Associates, all in furtherance of the scheme to defraud.

(11)  The mailings and emails described in this complaint and the deposition were predicate acts in furtherance of the scheme to defraud, and which damaged plaintiff by causing the employer/insurers/claims adjusters to deny and dispute or continue their denial and dispute of plaintiff's claim in 2008, 2009, 2010, and 2011.

(12) A hearing was held in plaintiff's claim before the Agency, and a magistrate accepted the testimony of Dr. Drouillard over that of Drs. Balarezo and Abrahmson; he found that plaintiff's occupation did not contribute to the degeneration of her cervical spine, and that she was not disabled in any way after the Oct. 12, 2007, examination by Dr. Drouillard.

(13) Defendants' fraud proximately damaged plaintiff's workers compensation claim and injured plaintiff by causing loss of her workers compensation benefits (wage loss and medical care), delayed receipt of her benefits, loss of benefits due to the compromise of litigation, and attorney fees and expense.

(14) Ins Co of Penn and New Hampshire insured the workers compensation claims made by plaintiff, and or they were self insured by DHL.

WHEREFORE, Debra Poloskey seeks judgment of treble damages jointly and

severally against defendants, plus attorney fees and costs  as provided by 18 U.S.C. 1964, and by other statutes and court rules.

34 F.  BRIAN EASON

(1) At all relevant times, Brian Eason was employed by DHL or its predecssor, Airborne Express, and or DHL Express USA Inc, in a job involving repetitive heavy lifting often while twisting and bending, and repetitive stepping in and out of vans and trucks while carrying freight, and pushing/pulling freight or containers of freight. Paychecks were issued by DHL and not DHL Express.

(2) On or about 10/2/08, while employed by DHL Express in Romulus MI, plaintiff was pushing a cast iron fire hydrant which weighed over 250 lbs. and as he was pushing it, he hurt his LS spine and lost feeling in his right leg.  Thereafter, DHL Express and its workers compensation insurer, New Hampshire,  paid workers compensation to plaintiff.

(3) On or about May 7, 2009, Belinda Belasco of Sedgwick in Troy Michiganmailed and used the phone and or email to contact Dr. Miles Singer or his agent to set up a medical examination by Dr. Singer of plaintiff, and then on or about 5/7/09, Belasco in Troy Michigancaused MEG (Michigan Evaluation Group) at 264000 Lahser Rd, Southfield MI, to mail to plaintiff on Bayhill Ct in Romulus, MI, a letter stating "an independent medical evaluation has been scheduled for you at the

request of Belinda Belasco from Sedgwick Claims Mgt Service."

(4)   About 3 or 4 days before plaintiff received the 5/7 exam cite letter, Belasco in Troy Michigancalled him in Romulus Michiganstating she was sending him to the medical exam me "so we can get better treatment" for plaintiff, because he was asking Belasco to go to Dynamic Back Rehab; plaintiff told her he really needed more treatment and his back was spasming.   She told plaintiff she was going to send him to "an independent doctor" and will decide then; she called plaintiff's cell, 313 401 1825, in Redford MI.

(5) On or about 7/1/09, Belasco in Troy Michiganmailed a Notice of Dispute to the Workers' Compensation Agency in Lansing Michiganand also mailed a Notice of Dispute to plaintiff in Romulus MI.

(6) The use of the mails and wires as described in this complaint of Brian Eason are predicate acts of mail and wire fraud.

(7) The representation of the exam as "independent" was fraudulent because Belasco did not intend to get an examination independent of bias and independent in judgment, but to get an exam which would favor Sedgwick and the workers compensation insurance company.   Dr. Singer was  known to Belasco to be a doctor which favored the insurance company in workers compensation cases.  Dr. Singer did not intend to write a fair and unbiased report.

(8) When plaintiff was with Dr. Singer, on 6/8/09, Dr. Singer told him he was partly disabled and that he (Dr. Singer) would place a work restriction on him and send him back to work at DHL.   Plaintiff then told Dr. Singer DHL would not take him back to work with any restriction.

(9)  Dr. Singer then wrote a report, dated June 8, 2009, which he signed and transmitted over the wires.   In this report, Dr. Singer stated plaintiff was able to work without restriction, contrary to what he told plaintff , and stating "At the time of this examination, I find no physical impairment or objective physical findings that would correlate with his ongoing complaints."

(10) On or about 6/8/09, Dr. Singer or his agent used the mails or wires to bill Sedgwick and or MEG for his examination and report.

(11) On or about Nov. 3, 2009, Dr. Singer received by fax from Marshall Lasser, attorney for Mr. Eason, a report of a July 26, 2009, MRI, and reports of 7/30/09 from Dr. Chetan Patel and 7/29/09 from Dr. Philip Friedman.   The MRI report contained this finding, inter alia:

IMPRESSION: ....broad-based protrusion [at L4-5] with annular rent and

Severe thecal sac compression is noted at both the L4-5 and L5-S1 levels...

The MRI findings provided an objective basis for pain complaints.  Also, this quoted finding was more severe than the finding in the 11/20/08 MRI report which Dr. Singer

had at the time of his report.   The 11/08 MRI report reported only mild indenting of the thecal sac.   Dr. Friedman reported "at this time, he continues to be disabled by chronic mechanical low back pain related to a disc protrusion."

(12) Despite having received documents demonstrating disability and work relationship, defendants denied and defrauded plaintiff of his benefits.

(13) In 2008, 2009, and 2010, the employer/insurer/claim adjuster defendants continued to violate RICO up to the date of settlement, in that they continued to use the fraudulent medical examinations and depositions to deny and dispute plaintiff's claim, and they used the mails and wires on dates unknown to plaintiff and in the exclusive possession of defendants in furtherance of the scheme.

(14) Defendants' fraud proximately damaged plaintiff's workers compensation claim and injured plaintiff by causing loss of his workers compensation benefits (wage loss and medical care), delayed receipt of his benefits, loss of benefits due to the compromise of litigation, and attorney fees and expense.

(15) Ins Co of Penn and New Hampshire insured the workers compensation claims made by plaintiff, and or they were self insured by DHL.

WHEREFORE, Brian Eason seeks judgment of treble damages jointly and severally against defendants, plus attorney fees and costs  as provided by 18 U.S.C. 1964, and by other statutes and court rules.

34 G. MARTIN ZANE

(1)   At all relevant times, Martin Zane was employed by DHL or its predecessor, Airborne Express, and or DHL Express USA Inc, in a job involving repetitive overhead lifting, often heavy lifting, and pushing/pulling freight or containers of freight.   Mr. Zane began working at Airborne April 1995.   DHL here includes Airborne.

(2)   Plaintiff suffered his first shoulder injury working for DHL and or its predecessors in 3/1999.   Plaintiff tore his right rotator cuff pulling a heavy box.   DHL paid workers compensation. Dr. Stephen Plomaritis. Plaintiff returned to work. 10/99 and worked without shoulder disability until 2005.

(3)   On 1/25/05, plaintiff was injured when he slipped on the step of his truck while getting out and while hanging onto a door grip with his right hand, yanking the right shoulder to the point of injury.   Mr. Zane had right shoulder surgery 10/05 by Dr. Plomaritis and returned to work approximately 1/30/06.

(4)   Despite having clear and abundant evidence that the shoulder injury and disability following the 10/05 work event, DHL, its insurer, its TPA (SRS) and its attorneys denied benefits for the 2005 injury and continued to deny benefits for the 2005 injury until a Voluntary Payment (VP) agreement was entered into in 2007.   The following acts of mail fraud were used in furtherance of the scheme to defraud, with

98

regard to the period of work loss in 2005 and 2006.

(a) The mailing on 5/11/05 to the Agency and to plaintiff a Notice of Dispute stating "current medical condition not work related."

(b) The remailing of that Notice of Dispute by defendants SRS, National Union and DHL, through their attorney T. Felker, on 2/7/06 to the Agency in Lansing Michiganand to Zane's lawyer, Marshall Lasser, in Southfield MI.

(c) The mailing on 2/7/06 a CARRIER'S RESPONSE to the Agency and to Lasser which fraudulently stated the injury was not work related and Zane was not disabled.

(d) The mailing on 3/14/06 by defendants SRS, National Union and DHL, through their attorney T. Felker, to the Agency in Lansing Michiganand to Zane's lawyer, Marshall Lasser, in Southfield, MI, an AMENDED CARRIER'S RESPONSE which fraudulently stated the injury was not work related and Zane was not disabled.

(e) The use of the phone and or the mails by Jeffrey Lawley on or about 2/7/06 to arrange an examination of Mr. Zane.

(5)   On or about 5/15/2007, Mr. Zane had recurrent right shoulder problems due to his work-related injury, and he was taken off work by his surgeon, Dr. Stephen Plomaritis.

(6)  On 7/6/07, Laurie Dexter of SRS in Troy, MI, mailed to plaintiff in Allen

Park Michigana letter citing him to an evaluation examination on 7/13/07 with Paul Drouillard, identifying Drouillard as an "independent physician." This statement was fraudulent in that Drouillard was not "independent" but was biased toward SRS because he was paid hundreds of thousands of dollars per year doing examinations and reports and testimony for workers compensation insurers and self insurers; he was selected because he was known to be biased, and in that defendants did not want an honest evaluation of plaintiff but one they could use to cut off or deny benefits.

(7) After the exam, Dr. Drouillard wrote a report stating Mr. Zane could return to work without restriction; Drouillard mailed the report to Dexter, and Dexter mailed them to plaintiff, both acts of mail fraud.   DHL/SRS cut off benefits.

(8) Because he was cut off benefits due to Drouillard's report, Mr. Zane returned to work full duty with right shoulder pain, although his treating surgeon had not released him for work without restriction.   Zane worked with increasing right shoulder pain until the injury of 11/08, suffering further damage to the shoulder because of the premature return to full duty.   Dr. Plomaritis will testify that by returning to work prematurely, as a direct result of the cutoff report of Dr. Drouillard, Mr. Zane worsened his shoulder.

(9) The citation letter issued in 2007 by SRS or Sedgwick in KY or Troy, MI, and sent to plaintiff in Allen Park, MI, citing him for examination by Dr. Drouillard,

and Dr. Drouillard's 2007 report finding no work-related disability, mailed by Sedgwick or SRS in KY or Troy Michigan to plaintiff in Allen Park, MI, were mailings in furtherance of the scheme to defraud, in violation of 18 U.S.C. 1341. Dr. Drouillard used the mails or wires to transmit the report, and to bill for it, and he thus committed mail fraud in furtherance of the scheme to defraud.   On information and belief, Dr. Drouillard also used the wires to set up the examination date and time, on dates which are in the exclusive possession of defendants; these were acts of wire fraud in violation of 18 U.S.C. 1343.   These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.   All mailings identified in this complaint of Martin Zane were mail fraud in violation of 18 U.S.C. 1343 in that they were used to further the fraudulent scheme of defendants.     Relying on Dr. Drouillard's report, the employer/insurer/TPA ordered plaintiff to return to work, which resulted in plaintiff suffering further and more permanent injury to his shoulder.

(10)   On Nov 10 or 11, 2008, while picking up a heavy box at work, the shoulder popped at work and Mr. Zane felt stabbing pain in the right shoulder.   He has not worked since that date, and DHL  by and through its insurer and or TPA paid workers compensation benefits for that injury until Sedwick/DHL cut off benefits again on 3/12/08.   Dr. Plomaritis, who has treated plaintiff's repeated right shoulder

injuries at work since 1999, did a fourth surgery in April 2010, and he has given plaintiff a permanent disability which he states is due to the multiple right rotator cuff injuries at work and the surgeries done to treat those injuries. He sent to Sedgwick proof of plaintiff's permanent disability and its work-relatedness.

(11) On or about 9/21/09, Sedgwick mailed a letter from KY to plaintiff citing him under section 385 of the WDCA to an examination with Jeffrey Lawley, stating the exam was an "independent medical evaluation." This letter and the electronic communications between Lawley and Sedwick to set up the exam were part of the defendants' scheme to defraud plaintiff of his workers compensation benefits, in that Lawley (partner of Drouillard) was not "independent" but was biased toward SRS because he was paid hundreds of thousands of dollars per year doing examinations and reports and testimony for workers compensation insurers and self insurers, and was known to defendants and their lawyers to write "cut off" reports (reports that would find no work-related disability regardless of the truth); he was selected because he was known to be biased, and in that defendants did not want an honest evaluation of plaintiff but one they could use to cut off or deny benefits, and in that Dr. Lawley did not intend to be honest but to write a cutoff report.

(12) Dr. Lawley wrote a report dated 10/1/09. He or his agent emailed or mailed or faxed it to Sedgwick. The IME notice and report were predicate acts of

mail and or wire fraud by Lawley and Sedgwick.

(13)   Despite receiving in 9/09 a report from Dr. Lawley stating that plaintiff had no work related disability, Sedgwick did not cut off benefits until 5.5 months later.  On 3/12/10, it mailed a Notice of Dispute from KY or Michigan or IL to plaintiff in Allen Park, MI, and also mailed it to the Workers Compensation in Lansing MI; the Notice of Dispute stated, "All benefits denied.  Dr. Lawley's IME report of 10-1-08 confirms current condition is not related to injury on 11-10-08."  This cut off may been part of a scheme by defendants to cut off benefits not only to plaintiff, but to many or most DHL workers still on workers compensation after the 90% downsizing by DHL in Dec 2008 - Jan 2009.  These two mailings were predicate acts.

(14) Neither Sedgwick nor Lawley determined honestly (or determined at all) whether plaintiff's occupational duties contributed to disability.

(15) In 2008 up to the date of this complaint, the employer/insurer/claim adjuster defendants continued to violate RICO up to the date of settlement, in that they continued to use the fraudulent medical examinations and depositions to deny and dispute plaintiff's claim, and they used the mails and wires on dates unknown to plaintiff and in the exclusive possession of defendants in furtherance of the scheme.

(16)    The fraud of defendants proximately damaged plaintiff's workers compensation claim and caused plaintiff damages in that he had to pay an attorney and

the expenses of litigation to recover his workers compensation benefits, and he lost benefits and the time value of those benefits due to the compromise of litigation and the delayed receipt of benefits.   The 2007 report of Dr. Drouillard and cut off of benefits following that report injured plaintiff in that it forced him to return to work prematurely in 2007, before his injury was sufficiently healed, so that he suffered further injury and loss of income and benefits due to the premature return to work. Plaintiff's losses exceed $75,000.   The cutoff in March 2010 caused loss of benefits.

WHEREFORE, Martin Zane seeks judgment of treble damages jointly and severally against defendants, plus attorney fees and costs  as provided by 18 U.S.C. 1964, and by other statutes and court rules.

34 H.  ALLEN MURRAY

(1) This claim is against Dr. Phillip Mayer and SRS only.  DHL and its insurers have been released.

(2)   At all relevant times, Allen Murray was employed by DHL or its predecessor, Airborne Express, and or DHL Express USA Inc, in a job involving repetitive overhead lifting, often heavy lifting, and pushing/pulling freight or containers of freight.   Mr. Murray began working at Airborne in 1991.

(3)   In Feb. 2004, Mr. Murray underwent L3-5 fusion by Dr. Eric Truumees, following complaints of many months of back pain radiating into the leg, and

following diagnoses of degenerative LS disc disease and spondylolisthesis L3-4 and L4-5.   Murray returned to full duty work June 2004.

(4) On 3/17 or 21/07, plaintiff suffered low back injury at work while lifting a 150lb skid with another worker; he was off work for several months; returned to work and then his low back pathology and pain got worse due to resuming full duty, and perhaps due to a fall at home when his legs gave way due to his back problem. Plaintiff was treated at defendant's industrial clinic, Concentra Medical Center, Greenfield Rd, Southfield.

(5) On 6/3/07, Concentra sent plaintiff back to work without restriction.   On 6/8/07, after working 5 days, plaintiff's back worsened, due to the repeated heavy lifting, twisting and bending involved in his job, to the point he was unable to continue working.   He was sent again by DHL to Concentra Medical Center, which took him off work.

(6) SRS was the TPA adjusting plaintiff's workers compensation claim from before the date of injury until 12/1/08.   It made decisions and recommendations regarding the handling and payment of the claim from the date of injury until that date.   These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery. Communications among and between SRS, DHL, the workers comp defense

attorneys, and the Ins Co of PA are in the exclusive possession of defendants and their attorneys.

(7)   Workers compensation benefits were paid by SRS until they were cut off in 2/08.

(8)   On or about SRS, Laurie Dexter, Auburn Hills, MI, mailed on 12/19/07 to plaintiff in Redford, MI, a letter requiring plaintiff to appear at an "independent medical examination" with Dr. Grant Hyatt.   This letter was a predicate act of mail fraud, used in furtherance of the scheme to defraud plaintiff of his benefits.   In 1/08, SRS mailed or electronically transmitted to Dr.  Hyatt payment for the IME exam and report; this was mail or wire fraud.  The date and manner of this communication is in the exclusive possession of SRS.  These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

(9)  Dr. Grant Hyatt wrote his report on 12/27/07 to SRS.  Inter alia, it stated,

ETIOLOGY:

The patient's current condition is related to the alteration of biomechanical forces across the L5-S1 disc space caused by the prior fusion at L3-4 and L4-5 **and the patient's subsequent physical activities.**  Because of the potential for the development of junctional

106

degeneration at L5-S1 due to his prior fusion, the patient was not a good

candidate for engaging in heavy physical activities and the subsequent

manifestation of back pain three years after the successful fusion would

not be unexpected.

(10)   Upon receipt of this report SRS cut off benefits.  SRS, by Laurie Dexter

in Auburn Hills, MI,  mailed to plaintiff in Redford Twp, MI, and to the Workers

Compensation Agency in Lansing MI, a Notice of Dispute, on 2/6/08, cutting off

benefits, giving as reason,  "per independent medical evaluation of 12/27/07 and

followup with Dr. Liem at Concentra  of 1/24/08, employee has recovered from his

reported work injury of 6/8/07 and is back to pre-injury status.   Any further wage

benefit and/or medical benefit is being disputed."  These two mailings were predicate

acts of mail fraud.   **The 12/27/07 report of Dr. Hyatt did not state that plaintiff**

**had recovered from his reported work injury of 6/8/07 and had returned to his**

**pre-injury status.**

(11)  Furthermore, SRS, as TPA of Michiganworkers compensation for DHL

and its insurer,  knew that under sections 301 and 401 of the WDCA (MCL 418.301

and 418.401) a condition of the LS spine aggravated or significantly aggravated by

work activities was compensable; Dr. Hyatt's report stated that plaintiff's "current

orthopedic condition is related to the alteration of biomechanical  forces across the L5-

S1 disc space caused by the prior fusion at L3-4 and L4-5 and the patient's subsequent physical activities."   This statement was a sufficient basis for SRS not to cut off benefits; the ETIOLOGY portion of the report did not provide a basis for the cut off of benefits for the reasons stated in the Notice of Dispute.

(12)   SRS committed other predicate acts of mail and wire fraud when it mailed in 5/08 a check to T. Felker, the defense workers compensation lawyer, for him to send to plaintiff to attend a medical exam by Dr. Phillip Mayer, and when in 6 or 7/08 in mailed a check to Dr. Mayer for payment for his 6/20/08 examination and report, or transmitted payment by interstate wire.  At least four other predicate acts of mail fraud were committed by employees of SRS, in May, June, July, August, September, October and November  2008 when they communicated by mail with Mr. Felker and or DHL and or Dr. Mayer concerning (1) examination of plaintiff by Dr. Mayer, and (2) the handling of plaintiff's claim; the dates and exact manner of the mailings are in the exclusive possession of defendants.  These allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

(13)   The use of Dr. Mayer to examine plaintiff, report on plaintiff, and testify on behalf of SRS and other defendants, was part of the scheme to defraud.   It was fraudulent because, inter alia,  SRS, DHL and its insurers had already obtained a

108

report from Dr. Hyatt concerning the issues of disability and the etiology of the disability.  Dr. Hyatt's opinions, that plaintiff was disabled from his former job and that his condition arose in part from the work he did for DHL since 2004, were unfavorable to DHL, SRS and the insurer defendants, and for that reason they or their attorney sought an opinion from Dr. Mayer, knowing that he was a "cut off" doctor, that is, a doctor who could be relied on to find no work-related disability.  These defendants, upon advice from their lawyers, knew they would lose the case with Dr. Hyatt's report, if that was the only IME report they had.

(14) Dr. Mayer committed mail fraud when on June 30, 2008, he mailed two reports to Mr. Felker.  The reports were fraudulent for reasons stated in pars. 7-31.  Also, the reports were fraudulent in that Dr. Mayer (1) falsely stated he was performing an "independent" medical examination, when in fact he was closely tied financially to the entities defending Michigan workers compensation cases, and (2) he did not intend to be fair, honest, independent and unbiased.

(15)  Dr. Mayer stated on page 7 of the "independent medical evaluation report":

> I find no evidence of acute pathology that can be specifically and causally related to Mr. Murray's occupational activities or the single incident in question that would be considered the cause of his current

complaint. The development of adjacent segment degenerative change occurs over time and does not represent the result of a single acute incident or activity. Given the findings on the examination, I do not find any objective factors that would cause undue risk for Mr. Murray to pursue normal activities.

(16) These opinions were not intended to by Dr. Mayer to be fair, unbiased and independent. Also, they were beyond the boundary of reasonable differences of medical opinion, especially but not limited to the statement "I do not find any objective factors that would cause undue risk for Mr. Murray to pursue normal activities," in that the prior fusion at L3-5 and the subsequent degeneration at L5-S1 were objective factors creating "undue risk" for Mr. Murray's job, which involved repetitive heavy lifting, bending, twisting.

(17) After June 30, 2008, the employer/insurer/claim adjuster defendants continued to violate RICO up to the date of settlement, in that they continued to use the fraudulent medical examinations and depositions to deny and dispute plaintiff's claim, and they used the mails and wires on dates unknown to plaintiff and in the exclusive possession of defendants in furtherance of the scheme.

(18) The fraud of defendants proximately damaged plaintiff's workers compensation claim and caused plaintiff damages in that he had to pay an attorney and

110

the expenses of litigation to recover his workers compensation benefits, and he lost benefits and the time value of those benefits due to the compromise of litigation and the delayed receipt of benefits.   Plaintiff's losses exceed $75,000.

WHEREFORE, Allen Murray seeks judgment of treble damages jointly and severally against SRS and Dr. Mayer, plus attorney fees and costs  as provided by 18 U.S.C. 1964, and by other statutes and court rules.

34.I.  JOSE RODRIGUEZ

(1)  At all relevant times, Jose Rodriguez was employed by DHL and or DHL Express USA Inc, in a job involving repetitive overhead lifting, often heavy lifting to and above 75lbs, and pushing/pulling freight or airplane containers ("cans") of freight weighing up to 4,000 lbs, and often the rollers or wheels of the cans would stick and require great force to push them.   Mr. Rodriguez began working at DHL in 2004. Before the DHL job, he worked for FedEx for about 7 years as a delivery driver.

(2)  Plaintiff injured his LS spine in 2006 working for DHL, while picking up a heavy box at a delivery, and missed a couple of months of work.  He had no pain down the legs. After he returned to work for DHL, he worked without problem from his LS spine until 5/15/08, at which time he hurt his LS spine working for DHL, while exiting a DHL vehicle.  He has had pain down the left leg.  He has not worked for DHL since that date.

(3) DHL sent him to Dr. Carr for "independent medical examinations." In his report of June 3, 2009, Dr. Carr concluded:

> Based on the updated lumbar MRI scan and my examinations of July 10, 2008, and April 28, 2009, as well as review of the evaluation of Dr. Ross of April 30, 2008, **I continue to feel that Mr. Rodriguez sustained an element of left L5 and L4 nerve root compression, radiculopathy, and/or nerve root bruising from the incident of May 15, 2008.** Admittedly, degenerative disease is present in his lumbar spine and is a significant component of the findings on MRI and x ray studies, but he has clinical evidence of left L4 and L5 radiculopathies, and I believe he should now be evaluated by a treating spine surgeon and/or neurosurgeon, with possible consideration of nerve root decompression to address the **work-related radiculopathy.** (emphasis added)

(4) In December 2009 or early January 2010, Judy Marshall of Sedgwick mailed from Troy Michigan to plaintiff in Dearborn Hgts, Michigan a letter ordering him to attend an "independent medical examination" by Dr. Lawley. This was a predicate act of mail fraud in furtherance of the scheme to defraud. Inter alia, defendants were not seeking an unbiased, impartial and honest opinion. Dr. Lawley was not "independent" for reasons stated in this complaint.

(5) Judy Marshall, on information and belief, committed dozens of other predicate acts of wire and or mail fraud when she set up other "IMEs" with fraudulent doctors such as those sued herein, and mailed letters to DHL employees ordering them to go the examinations.  She also committed many other predicate acts of mail and or wire fraud when she mailed the reports to the claimants, notices of disputes to the Agency, payment or approval of payment for the "IMEs" and for the worker's attendance expenses; defendants have exclusive possession of the dates and contents of these wired and mailed communications.

(6)    On January 18, 2010, plaintiff attended the examination of Dr. Lawley, with his wife, who was present at the examination.  Lawley wrote a report which was an act of mail fraud, for reasons including the following:

(a) he intended to favor DHL and Sedgwick rather than make an independent, honest, and unbiased examination and report.

(b) He lied when he stated on page 9 of his report, "Mr. Rodrigquez informed me that he never had any problems with this back prior to the May 15, 2008, work injury."  This was a lie because Mr. Rodriguez told Lawley about the 2006 injury, and gave the staff at MEG, where the exam took place, his medical records made after the 2006 injury, such as the 2007 discogram by Dr. Lee, which Dr. Lawley admits on page 9 of his report that he possessed.  Plaintiff also gave Lawley other records of

the2006 injury, such as Dr. Carr's report, x rays, and MRI.   Dr. Lawley also lies in stating, "He also had a lumber discogram performed by Dr. Kevin Lee on April 2, 2007, which he did not inform me of."   Plaintiff gave the discogram to the office staff at MEG, where the exam took place.

(c) Plaintiff and or his wife, Alma, told Dr. Lawley that plaintiff had had urinary incontinence at least twice in the months before the exam, and Dr. Lawley omitted that fact from his report.

(d) Plaintiff told Dr. Lawley that his job required to push and pull 4,000 airfreight containers ("cans"), and had to do this sometimes when they got stuck, Lawley omitted these facts from his report.

(d) Dr. Lawley asked plaintiff if he had had pain going down the legs before the May 15, 2008 injury, and plaintiff told him "no."  Dr. Lawley omitted this fact from his report.

(e) Plaintiff showed Lawley photos on his Iphone of his left calf showing severe cramps; Lawley omits this fact in his report.

(f) Dr. Lawley false stated plaintiff smoked 1 ½ packs a day; plaintiff told him ½ a pack.

(g) Plaintiff told Dr. Lawley that in 2009 he twice had to go to Henry Ford Dearborn ER due to severe pain in the lower limbs; plaintiff showed him the bill. Dr.

Lawley omits mention of these facts from his report.

(h) Although plaintiff and his wife told Dr. Lawley of pain in the legs and other symptoms indicating radiculopathy, Dr. Lawley concluded:

> It is my opinion that Mr. Rodriguez is currently manifesting symptoms of lumbar spondylosis. This degenerative condition was in no way caused or aggravated by the May 15, 2008, injury.

(i) Dr. Lawley's opinion was fraudulent for reasons stated throughout the complaint. Inter alia, he did not intend to be honest and unbiased. He did not consider whether the disability might be related to the occupation. He did not consider the three reports of Dr. Carr. He did not consider all the medical records from 2006 to the date of his report, or at least all the important ones. He ignored the photos and complaints of leg cramps and involuntary urination. He ignored the complaint of intermittent pain that radiates into both lower extremities, with his left side being more frequent and more severe than his right lower limb. He deliberately falsified his report by omitting significant information plaintiff and his wife told him at the examination, and by including false statements.

(7) Lawley used the phone or mails or wires to bill for his work and to deposit or invest the funds received; these are predicate acts.

(8) DHL, Sedgwick and the insurer(s) cut off benefits based on Dr. Lawley's

report, mailing a Notice of Dispute authored by Judith Marshall from Troy Michiganand or Kentucky to the Agency and to plaintiff in Dearborn Hgts, on or about 2/3/10.   These two mailings were acts of mail fraud.

(9) Inter alia, Marshall, DHL, the insurer and Sedgwick ignored and disregarded the three reports of Dr. Carr in cutting off benefits, and may have ignored or disregarded the medical reports from other physicians.    They did not consider whether plaintiff's occupation contributed to the disability.  These defendants did so as part of their fraudulent scheme, and with the intent not be honest, thorough, fair, unbiased and impartial in weighing and examining all the medical evidence.  They were determined to cut off benefits.

(10) In 2008, 2009, 2010 and 2001, the employer/insurer/claim adjuster defendants continued to violate RICO in that they continued to use the fraudulent medical examinations and depositions to deny and dispute plaintiff's claim, and they used the mails and wires on dates unknown to plaintiff and in the exclusive possession of defendants in furtherance of the scheme.

(11)    The fraud of defendants proximately damaged plaintiff's workers compensation claim and caused plaintiff damages in that he had to pay an attorney and the expenses of litigation to recover his workers compensation benefits, and he lost benefits and the time value of those benefits due to the compromise of litigation and

the delayed receipt of benefits.   Plaintiff's losses exceed $75,000.

WHEREFORE, Jose Rodriguez seeks judgment of treble damages jointly and severally against DHL, Marshall, New Hampshire Ins. Co, and Dr. Lawley, plus attorney fees and costs  as provided by 18 U.S.C. 1964, and by other statutes and court rules.

34 J.  KENNETH COOPER

(1) Kenneth Cooper sues only Dr. Drouillard.

(2)  At all relevant times, Cooper was employed by DHL and or DHL Express USA Inc or  the predecessor, Airborne Express, in a job involving repetitive overhead lifting, often heavy lifting to and above 75lbs, and pushing/pulling freight or airplane containers ("cans") of freight weighing up to 4,000lbs, and often the rollers or wheels of the cans would stick and require great force to push them.   Mr. Cooper began working at DHL/Airborne in 2/94.

(3) Before his employment at Airborne/DHL, plaintiff had no neck or shoulder injury.

(4) On 5/2/00, he hurt his right shoulder working for Airborne/DHL, tearing the rotator cuff; it was surgically repaired.  The right shoulder was fine by 9/01.

(5) On 11/3/03, plaintiff injured his left shoulder and cervical spine at work, loading 700lbs of freight onto a truck with urgency, lifting large and heavy parts.

(6)   He filed a workers compensation claim against DHL/Airborne and its insurers, claiming benefits for injury to the left should and cervical spine.

(7) Dr. Todd Prochnow did fusion surgery on the neck in 4/04; it was not successful; he then began treating with Dr. Harry Herkowitz.

(8) Defendants sent plaintiff to Dr. David Carr for an "IME" on 4/12/05.  Dr Carr concluded in a report dated that day, inter alia: "cervical disc herniation, with radiculopathy, work-related by history."  However, on 10/23/2008, when defendants deposed him in the workers compensation case, he re-reviewed on that day the same medical records he reviewed before writing his report, and changed his opinion, stating the neck disc herniations were not work related, but also stating "I would still say be history provided by Mr. Cooper, the way he presented the facts, that the disc herniation would be work related" (depo 36).   He changed his opinion despite admitting (depo 36) that he had no additional medical records beyond those he had on 4/12/05, admitting (depo 35) that when he concluded in his 2005 report that the neck herniation was work related he had reviewed all the records, and admitting (depo 25) "I may have been a little - may have erred somewhat by not saying I don't think in the end the disc herniations are work related....I should have said I don't relate the disc herniations to the work history."  He stated, "I never changed my opinion until I looked at the evidence today."   On information and belief, he may have changed his

opinion before that day, as a result of email or phone communications with defendants and or their Michigan workers compensation lawyer, T. Felker (then of Lacey & Jones) or his associate, or on that date as a result of express or implied pressure applied by the attorney and defendants to make the change to favor defendants. If discovery reveals this to be the case, that is fraud by defendants and Dr. Carr (however, defendants other than Dr. Drouillard have been released from any claim for such fraud).

(9) Dr. Todd Prochnow and his associates treated plaintiff from 2000 onwards. Dr. Prochnow did a neck fusion, which failed; during the neck surgery, he found pathology which was both traumatic and degenerative (dep 19). He ordered a left shoulder MRI , done on 12/11/05, which Dr. Prochnow said reported a complete tear with moderate retraction and degenerative changes in the AC joint, with possible biceps or labral pathology. He testified at deposition 6/20/08 that the occupation made a significant contribution to plaintiff's left shoulder pathology (dep 23, 24). In 2006, he recommended surgical repair of the left shoulder.

(10) Laurie Dexter of SRS mailed a letter from Troy to plaintiff in Jan. 31, 2007, requesting that he appear for an "independent medical examination" with Dr. Paul Drouillard. This was a predicate act of mail fraud. Inter alia, the examination was not independent and SRS selected Drouillard because it knew he could be relied

119

on to find no work-related disability.

(11)   Dr. Drouillard mailed from MES in Westland Michiganreports dated 1/31/07 to Laurie Dexter of SRS in Troy Michiganand 4/20/07 to T. Felker of Lacey & Jones law firm in Birmingham MI; these were predicate acts of mail fraud.

(12)  Dr. Drouillard stated in the 1/07 letter:

> At this point in time, it appears to be quite clear that his [left] rotator cuff tear is related to a degenerative process...... He.... does not have significant functional impairment of the [left] arm.

(13) He stated in the 4/20/07 letter:

The left shoulder is related to a degenerative process and is not related to his employment.  The surgery on the neck was done for a degenerative process.  At this point in time, I do not feel he is disabled.  The degenerative process in the left shoulder is not work related, nor is the problem with his cervical spine.

(14) These statements were made in furtherance of the scheme to defraud.  Inter alia, Dr. Drouillard never examined Mr. Cooper's neck.  He was sent for evaluation of the left shoulder only.

(15) On 5/21/07, Laurie Dexter mailed from Troy Michiganto plaintiff in Monroe Michiganand to the Agency Michigana Notice of Dispute terminating benefits "per addendum report of Dr. Drouillard."  This mailing was an act of mail fraud.

(16)  Other Predicate Acts. In the summer of 2008, the employer/insurers/claim adjusters and their attorney agents used the mails and wires to set up the deposition of Dr. Drouillard.  On August 25, 2008, Dr. Drouillard gave a deposition, in which he acted in furtherance of the scheme to defraud by opining that plaintiff had no work-related injury to his shoulder.   Defendants transmitted the deposition and summaries of the deposition to each other by use of the mails and wires (faxes and emails).  On or about 5/13/08, SRS inTroy Michigancommunicated by mail, fax and or email with one or more co-defendants and or with T. F. Felker (defense workers compensation lawyer) concerning the Rehabilitation Progress/Transfer Report of Brown Rehab Management.  On 5/12/08, Mr. Felker's office in Bingham Farms Michiganphoned Brown Rehab Mgt in Southfield Michiganconcerning the case. The dates and or other details of these predicate acts of wire and mail fraud are in the exclusive possession of defendants; these allegations are based on information and belief, and are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.

(17) The defendants never evaluated or gave fair and honest consideration to whether plaintiff's occupation gave rise to  defendant's liability under sections 301 and 401 of the WDCA.

(18) The employer/insurer/claim adjuster defendants continued to dispute the

claim dispute the deposition they received of the treating surgeon.

(19)   The fraud of defendants proximately injured plaintiff's workers compensation claim and caused plaintiff damages in that he had to hire and pay an attorney and to pay the expenses of litigation to recover his workers compensation benefits, and he lost benefits and the time value of those benefits due to the compromise of litigation and the delayed receipt of benefits.

(20) During the relevant time periods, New Hampshire and or National Union and or Hartford and or Ins. Co. Of PA. insured the claims.

WHEREFORE, Kenneth Cooper seeks judgment of treble damages jointly and severally against defendants, plus attorney fees and costs  as provided by 18 U.S.C. 1964, and by other statutes and court rules.

**35. PRAYER FOR INJUNCTIVE RELIEF.** Plaintiffs seek equitable relief. They seek an injunction (1) forbidding Drs. Drouillard, Mayer, Prasad and Lawley from doing examinations pursuant to MCL 418.385; (2) forbidding DHL, Cambridge, National Union, SRS and Sedgwick from using a doctor for IMEs who in a certain percentage (to be determined) of such exams does not find a work-related injury, and ordering defendants to keep records from which it can be determined the percentage of such exams in which every doctor selected by a defendant has found no work-related disability; (3) requiring DHL, SRS, and Sedgwick to keep detailed and public

records of all deliberations and communications regarding every decision (a) to pay or deny workers compensation benefits, and (b) to select a doctor for an examination of a Michiganworkers compensation claimant, and (4) requiring DHL, National Union, SRS and Sedgwick to adjust and handle claims as required by the Michigan Insurance Code and the Workers Disability Compensation Act.

WHEREFORE plaintiffs pray for judgment against defendants in an amount exceeding $75,000, plus interest under this Act, costs and attorney fees, and injunctive relief as described above.

## JURY DEMAND

Plaintiffs demand a jury trial of all issues triable by jury.

/s/Marshall Lasser
Marshall Lasser P25573
PO  Box 2579
Southfield, Michigan48307
(248) 647-7722
mlasserlaw@aol.com

/s/Jeffrey T. Stewart (P24138)
Seikaly & Stewart P.C.
Co-Counsel for Plaintiffs
30300 Northwestern Hwy ste 200
Farmington Hills, MI 48334
(248) 785-0102
stewart@seikalystewart.com